THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v DWAYNE BODNER, Appellant.

Fourth Department, July 10, 1980

## APPEARANCES OF COUNSEL

*Charles Avery* for appellant.

*Ross M. Tisci (David O'Connor* of counsel), for respondent.

## OPINION OF THE COURT

HANCOCK, JR., J.

At 5:01 P.M. on April 25, 1978 in the Auburn police station, Dwayne Bodner, a 17-year-old boy with an I.Q. of 63 and a mental age of eight or nine, signed a written confession in the presence of his father in which he admitted setting four separate fires. After a jury trial, where the confession and substantial corroborating evidence of the fires were introduced against him, Dwayne was convicted of four counts of arson, fourth degree. His appeal depends solely on whether the written confession and the testimony of the investigating police officer, Detective Malandruccolo, concerning Dwayne's inculpatory conduct and statements made prior to the confession were properly received in evidence. We relate briefly the significant facts preceding and surrounding Dwayne's confession.[1]

During the three-day period from April 22 to April 24, 1978, four fires occurred in sheds or garages in Auburn all of which bore evidence of arson. On April 25, 1978 at about 2:00 P.M., Dwayne walked into the police station, announced that he had been present when his cousin Jeffrey Knowlton had set the four fires and, according to Detective Malandruccolo, said, "I'll take you and show you where [he] started the fires, and how [he] started them." Accordingly, Detective Malandruccolo, accompanied by Dwayne and another officer, Detective Cioffa, proceeded under Dwayne's guidance in an unmarked police car to the scenes of the four fires where Dwayne described how his cousin had lit each one. In his testimony, Detective Malandruccolo emphasized that Dwayne "did all the talking," and that he was not questioned. Upon returning to the police station and after suggesting to Dwayne that he go home,

---

1. Detective Malandruccolo's testimony at the *Huntley* hearing was substantially the same as his testimony at trial. In our recitation of the facts, we refer to both.

Detective Malandruccolo immediately summoned Jeffrey Knowlton and his mother to police headquarters. After interviewing the two, he was "convinced that Jeffrey didn't set the fires * * * so [he] called at this time Dwayne Bodner." He spoke with one of Dwayne's parents and requested that one or both parents bring Dwayne to the police station. At trial, Detective Malandruccolo described what occurred upon Dwayne's arrival at the station with his father at 4:45 P.M.: "I told Dwayne * * * 'We checked out your cousin's alibi, and he was telling us the truth.' And, Dwayne said, 'I did, I lied to you.' * * * At this point in time, Detective Festa got a sheet of paper which we call the *Miranda* warnings."[2] After Dwayne and his father signed the waiver of rights form at 4:50 P.M., Dwayne's oral confession was reduced to writing and signed by him and his father at 5:01 P.M. Although Francis Bodner, Dwayne's father, testified that when he arrived at the police station Dwayne was already there, he did not deny that he was present when the warnings were given and the statement taken, that both were read aloud to them, or that he and Dwayne signed both documents. In his formal statement, Dwayne described how he set the first fire by lighting tomato sticks and some paper with a match and said: "I then got on my bike and went home and I turned on my police fire monitor. I then heard the Police radio and this lady said there was a fire at 196 Seymour Street. I then heard the fire trucks and I then went to 196 Seymour Street. I then watched the firemen." Each of the fires is similarly described. At the *Huntley* hearing and at trial defendant introduced uncontradicted proof—the records and testimony of two psychiatrists and a school psychologist—pertaining to Dwayne's limited intellect. Detective Malandruccolo acknowledged that he had been "on a first name basis" with Dwayne for four or five years and was aware of Dwayne's mental deficiency.

■ Defendant does not seriously question the conduct of the police in obtaining his assent to the formal written document; indeed, the evidence is uncontradicted that the police employed no coercive or improper tactics and gave completely adequate *Miranda* warnings (see *Miranda v Arizona,* 384 US

---

2. Detective Malandruccolo's description of the precise details of what occurred upon Dwayne's return to the police station was adduced at trial on direct examination by the People and is uncontradicted. The *Huntley* hearing was short and focused on the actual giving and signing of the *Miranda* warnings and Detective Malandruccolo was not questioned in detail about events leading up to the giving of the *Miranda* warnings.

436). Dwayne and his father, prior to signing the written confession, both willingly signed the waiver of rights form. The attack upon the court's ruling in admitting the confession and the testimony of Dwayne's statement and conduct preceding it rests on three other grounds:[3]

(1) that the actions of the police in their contacts with Dwayne prior to giving him the *Miranda* warnings and taking the formal confession amounted to improper custodial interrogation so that testimony of any incriminating conduct or statements by Dwayne during such contacts were inadmissible;

(2) that, if this court finds that such conduct and statements were the result of improper custodial interrogation and inadmissible, the subsequent giving of proper *Miranda* warnings before reducing the statements to a formal written confession was ineffective to render the formal confession voluntary and admissible; and

(3) that based on the proof of Dwayne's lack of intellectual capacity, the court should have ruled as a matter of law that he was incapable of understanding his legal rights or effecting a voluntary waiver thereof and should, for that reason alone, have excluded the written confession.

I

Inasmuch as no question is raised concerning the police procedures in actually taking defendant's formal confession, a

---

**3.** [1] Preliminarily, we reject respondent's arguments that defense counsel did not sufficiently preserve for our review on appeal the arguments he now presents against the admission of the confession and Dwayne's incriminating statements and conduct. The suppression motion papers state that the pre and postwarning confessions "were inadmissible as a matter of law in that they were elicited under inherently coercive circumstances as a direct and proximate result of constitutionally impermissible prearraignment custodial detention and interrogation by members of the police department." Although in the *Huntley* hearing defense counsel never stated the basis for his motion to suppress, he was never asked to do so. During the trial, he objected to the questioning of Detective Malandruccolo regarding Dwayne's initial arrival at the police station on the ground that when Dwayne entered the police station he was in a custodial situation and that thereafter any statements he made would have been involuntary. The objection was overruled. At the close of the People's case and at the close of all evidence, defense counsel renewed his objection to Dwayne's confession upon the ground that it was improperly obtained. We view this as a renewed motion to suppress the confession based on the evidence adduced at trial and find that defense counsel's objections in the motion papers and at trial were broad enough to encompass the issues we address.

challenge to its admissibility must depend on whether it was so inextricably intertwined with improper police conduct occurring prior to the giving of the *Miranda* warnings that the warnings were insufficient to protect defendant's rights. In any analysis of these earlier contacts between defendant and police, the focus must be on whether the incriminating actions and statements occurring prior to the *Miranda* warnings were the product of custodial interrogation, i.e., whether Dwayne was both under interrogation and in custody so that the procedural safeguards outlined in *Miranda* were required (see *Rhode Island v Innis,* 446 US —, 48 USLW 4506). A statement "given freely and voluntarily without any compelling influences is, of course, admissible in evidence" *(Miranda v Arizona, supra,* p 478). By the same token, a statement given in reply to police questioning may be admissible if given when the suspect is not in custody (see *People v Yukl,* 25 NY2d 585, cert den 400 US 851; *People v Rodney P. [Anonymous],* 21 NY2d 1).

The first issue in our two-step analysis of whether Dwayne's responses were the products of custodial interrogation is whether the prewarning police conduct amounted to interrogation. It is now settled that words or actions on the part of the police which are the functional equivalent of formal questioning may give rise to the requirement of the *Miranda* safeguards. As recently explained by the Supreme Court, "the term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating

response" *(Rhode Island v Innis,* 446 US —, —, *supra,* 48 USLW, at p 4509; emphasis in original).

Here, we must determine whether the police should have known that their actions toward Dwayne during the trip to the scenes of the fires and again upon his return to headquarters prior to the giving of the *Miranda* warnings were likely to elicit incriminating responses. We must also determine in the light of *People v Yukl (supra)* and *People v Rodney P. (Anonymous) (supra)* whether the circumstances surrounding the trip and his return to headquarters led Dwayne reasonably to conclude that he was in custody.

■ Applying these criteria, we scrutinize first the period from Dwayne's appearance at headquarters until he was told to go home by Detective Malandruccolo. Arguably, much or most of the police actions in permitting or tacitly encouraging a simple minded boy to point out and describe the details of the fires would constitute interrogation under the *Innis* test *(supra)* as actions likely to elicit incriminating responses. The police knew Dwayne; they knew of his mental deficiencies; and as trained investigators, they must have known that from his very first statement about his knowledge of and presence at the fires, Dwayne was incriminating himself without knowing it—either as a principal or an accomplice. We need not decide, however, how much if any of such police conduct amounted to interrogation, because there is insufficient evidence that Dwayne was in custody during this period. The unrefuted testimony is that Dwayne's appearance at the police station was voluntary and that it was he who suggested that he accompany the detectives to the fire scenes. There is no suggestion in the record that Dwayne was ever under restraint or that there was any time during the proceeding when he did not believe himself perfectly free to call a halt and go on his way. We cannot conclude as a matter of law on the proof before us that a reasonable man innocent of any crime or even a 17-year-old boy of limited intellect would necessarily have believed himself to be in custody *(People v Yukl, supra,* p 589) and that, therefore, testimony of Dwayne's actions during this period should have been excluded because *Miranda* warnings were not given.

■ Our analysis of the evidence surrounding Dwayne's response, "I did, I lied to you" upon his recall to the police station before receiving *Miranda* warnings leads us to a contrary conclusion. In our opinion, Detective Malandruccolo's

sudden confrontation of Dwayne, who by this time was the prime suspect, with the fact that the police knew that his cousin could not have set the fires, was unquestionably conduct "reasonably likely to elicit an incriminating response" *(Rhode Island v Innis,* 446 US —, —, *supra,* 48 USLW, at p 4509). Telling Dwayne that he knew that his cousin could not have set the fires was the same as telling Dwayne that he knew that Dwayne had set them and that Dwayne was lying. The spontaneous reply by the retarded youth—"I did, I lied to you"—when told that the police had seen through his transparent story was certainly to be anticipated. We find that it was a response intentionally elicited by police conduct.

We hold also that as contrasted with the interlude when Dwayne conducted the police to the fire scenes, Dwayne was in custody upon his return to the station. "[C]ustody occurs if the suspect is physically deprived of his freedom of action in any significant way or is led to believe, as a reasonable person, that he is so deprived" *(People v Rodney P. [Anonymous],* 21 NY2d 1, 9, *supra,* quoting *People v Arnold,* 66 Cal 2d 438, 447-448). Dwayne was at police headquarters. He had gone there at the request of the police for purposes of interrogation and upon arrival was confronted by two policemen in uniform. Without a doubt, the police at that time considered him the principal suspect and the chief target of their criminal investigation (cf. *People v Yukl,* 25 NY2d 585, *supra).* If Dwayne had not previously realized that he was under suspicion, he certainly must have when he was told that the police had checked and confirmed his cousin's alibi. A reasonable person would, at this point, undoubtedly have considered himself to be deprived of his freedom of action. Therefore, because it was a statement made in response to custodial interrogation without benefit of *Miranda* warnings, Dwayne's admission, "I did, I lied to you", is inadmissible.

## II

■ Having found Dwayne's oral confession, "I did, I lied to you", to have been induced by improper custodial interrogation, we next turn to the question of whether the subsequent administration of the *Miranda* warnings could have sufficiently served to protect Dwayne's rights and render his written confession admissible. We find that on the record before us the subsequent warnings could not have had that

effect (see *Westover v United States,* 384 US 436, 494;[4] *United States ex rel. B. v Shelly,* 430 F2d 215; *People v Chapple,* 38 NY2d 112; *People v Tanner,* 30 NY2d 102). Here the retarded youth, a boy fascinated with fires, sirens, and radios, like the moth irresistibly drawn to the flame, placed himself in the hands of the police and at the very center of their investigation. The police permitted the boy to implicate himself deeply by listening, perhaps with feigned belief, to his clumsy efforts to disguise his actions as those of his cousin. When Dwayne, upon his return to the station, was met by the jolting news that his cousin Jeff could not have set the fires and had given his immediate and fatal reply, "I did, I lied to you", it was all over except for reading aloud and explaining the written waiver of the *Miranda* safeguards, putting Dwayne's oral confession and his earlier recitals of the details into a formal written statement, and obtaining Dwayne's signature and that of his father on both documents—a routine task that took no more than 16 minutes.

When Dwayne made his oral confession, the police work had achieved its purpose and had done so, we hold, through custodial interrogation in violation of Dwayne's constitutional rights. The giving of the *Miranda* warnings before reducing the product of the day's work to written form could not undo what had been done or make legal what was illegal. The "[w]arnings, to be effective under the combined holdings in *Miranda* and *Westover,* must *precede* the subjection of a defendant to questioning" *(People v Chapple, supra,* p 115; emphasis in original). Here the progression from the improper questioning at headquarters to the signing of the formal confession was continuous and quick; and it cannot be claimed that there was an interruption during which Dwayne could be said "to have returned, in effect, to the status of one who is not under the influence of questioning" *(People v Chapple, supra,* p 115). Because the taking of the written confession followed almost immediately upon the improperly obtained oral confession and was deeply rooted in what had transpired before the *Miranda* warnings were given, it is unnecessary to remit to explore the factual question of whether after "letting the cat out of the bag" in his initial oral confession Dwayne's state of mind was such that he felt it futile to assert his rights (see *People v Tanner, supra,* pp 105-106). We find that the events progressing in an unbroken sequence from Dwayne's

---

4. *Westover* is a companion case to *Miranda v Arizona* (384 US 436).

initial appearance at the police station, to his conducting the police to the sites of the fires, to his sudden acknowledgment of guilt upon returning to the station, and culminating in the formalization of the collected information into a signed written statement, make the formal confession involuntary and, therefore, legally inadmissible (see *People v Chapple, supra,* p 114). We conclude, then, based on the proceedings in the hearings and at trial that the *Miranda* warnings and the written waiver of his rights (assuming that Dwayne was competent to understand them) could not have made his written confession admissible as one voluntarily made and that it should, therefore, have been excluded from evidence. Accordingly, there must be a reversal and a new trial.

### III

Because we are reversing the convictions and granting a new trial for reasons unrelated to Dwayne's ability to understand and effectively waive his constitutional rights, we do not reach his third contention based on cases such as *People v Bruce* (62 AD2d 1073) and *People v Davis* (23 AD2d 963), viz., that his low intellectual capacity rendered his waiver ineffective and his confession inadmissible as a matter of law.

There will be no proof of the formal confession or of the waiver of rights form in any retrial and no issue pertaining to capacity to waive will be presented. This is not to say, however, that Dwayne's mental insufficiency may not be relevant to some other issue. While proof of Dwayne's oral confession of guilt on return to the police station and the subsequent formal confession will be excluded, proof may be offered in a retrial of Dwayne's incriminating actions and statements during the trip to the four fire scenes. Whether Dwayne was being subjected to interrogation during this period and whether it would have reasonably appeared to him that he was in custody may involve factual questions to which his lack of mental capacity will be germane.

We hold (see n 3, *supra)* that defense counsel's objections sufficiently preserved for our review on appeal the questions we find decisive. Were we to hold otherwise we would, nevertheless, consider these issues, reverse, and grant a new trial in the exercise of our discretion pursuant to CPL 470.15 (subd 6, par [a]) (see *People v Thomas,* 50 NY2d 467; *People v Harris,* 77 AD2d 804).

For the foregoing reasons, the judgment should be reversed and a new trial granted.

CALLAHAN, J. (dissenting). I respectfully dissent and vote to affirm. As I view it, there is nothing improper in the police procedure utilized in conducting this investigation. The defendant voluntarily came to the police and related to them details concerning the activities of another whom he accused of committing arson. This lead was then thoroughly checked out and found to be false. Understandably, a request was made for defendant's return to further verify this tip. Knowing of his intellectual deficiency, he was requested to have a parent present. When advised by the police that the story he gave did not check out, the defendant voluntarily and spontaneously sputtered out "I did, I lied to you." Are we now to require an investigating officer to give *Miranda* warnings before saying anything else? This is not the meaning or the intent of any case relied upon by the majority. In my view too strict and narrow interpretation is being placed upon recent decisions.

SIMONS, J. P., SCHNEPP and MOULE, JJ., concur with HANCOCK, JR., J.; CALLAHAN, J., dissents and votes to affirm in an opinion.

Judgment reversed, on the law and facts, and a new trial granted.