**GOVERNMENT OF THE VIRGIN ISLANDS,**
**Plaintiff-Appellant**

v.

**RAY ROBERTS, Defendant-Appellee**

Criminal No. 81-51

District Court of the Virgin Islands

Div. of St. Thomas and St. John

July 2, 1982

---

[2] 33 V.I.C. § 3401 et seq. (1967 & Supp. 1981).

ALAN D. SMITH, ESQ., Assistant Attorney General (Department of Law), St. Thomas, V.I., *for appellant*

JACQUELINE W. HUBBARD, ESQ., Office of Territorial Public Defender, St. Thomas, V.I., *for appellee*

CHRISTIAN, *Chief Judge*

## OPINION

This interlocutory appeal puts into issue the meaning and scope of "custody" as defined by Miranda v. Arizona, 384 U.S. 436 (1966), as well as the criteria by which inculpatory statements are to be measured for "voluntariness" under the terms of the self-incrimination clause contained in both the Fifth Amendment to the U.S. Constitution and the Revised Organic Act of the Virgin Islands.

The Government brings this appeal from an Order entered by the Territorial Court of the Virgin Islands on March 23, 1981, suppressing as evidence certain statements made by defendant (the appellee herein) Ray Roberts. Jurisdiction for the appeal is grounded upon 4 V.I.C. § 39(b), which permits the Government to "appeal a ruling made during [a criminal] trial . . . which suppresses . . . the use of evidence on the ground that it was invalidly obtained, if the . . . prosecution . . . certifies to the Judge who made the ruling that the appeal is not taken for purpose of delay and that the evidence is a substantial proof of the charge being tried against the defendant." The record reveals that the Government has made the required certification and that the Court below granted leave for the appeal to be prosecuted. Accordingly, the jurisdiction of this Court to consider the appeal has been properly invoked.

## THE FACTS

Appellee Ray Roberts and two co-defendants were jointly charged with killing a brown no-horn bull belonging to one Herman Smith, a misdemeanor offense under the terms of 14 V.I.C. § 1266.[1]

The incriminating statements which were ordered suppressed were made under the following circumstances. In November, 1980, the incident involving the Smith bull came to the attention of Albion Sewer, a complaint officer and special assistant to the Attorney General, by way of widely circulating reports throughout Cruz Bay, St. John. Although Sewer is employed by the Virgin Islands Department of Law to process citizens' complaints, criminal as well as civil, and to investigate criminal matters assigned to him by the Department's prosecutors, his principal duties are those of a mediator or ombudsman responsible for resolving private disputes of a civil or small claims nature arising between inhabitants of the island of St. John. Hearing Transcript, 26. Although the record does not indicate whether or not Sewer is permitted to initiate a criminal complaint,[2] it is undisputed that he is without authority to make an arrest. Hearing transcript, 20.[3]

---

[1] Although the question is not raised on this appeal, it would appear that Section 1266 applies only where inanimate "real or personal" property is involved, and not, as in the present case, where an animal is allegedly destroyed. The appropriate charge would have been grand larceny, historically applicable in the Virgin Islands for the theft of livestock.

[2] The criminal complaint in this case was signed by Herman E. Smith and sworn to by Henry V. Carr, the Assistant Attorney General who appeared for the Government at trial.

[3] Because we dispose of the Miranda claim on the ground that defendant was not in custody at the time his statements were obtained, it is unnecessary to decide

On or about November 14, 1980, Sewer obtained information from one of Roberts' co-defendants, Buster Brady. In that conversation, subsequently summarized in a report to his superiors by Sewer, Brady admitted his participation in the crime subsequently charged and also implicated the appellee Roberts. Finding the statements to have been obtained in the course of a custodial interrogation by a law enforcement officer without the prior warnings mandated by Miranda v. Arizona, supra, the trial Court, upon motion of counsel for Brady, ordered the statements suppressed.[4]

About three days subsequent to his conversation with Brady, Sewer saw defendant Roberts driving a vehicle on a public thoroughfare in Cruz Bay, St. John. Sewer approached Roberts and said, "you guys are in trouble with Mr. Smith. He wants restitution for his animal, and he knows that you three guys are responsible . . . he was just at my office and claims that $900.00 would prevent him from taking legal action. Why don't you three guys get together and pay the man for his cow?" Roberts then smiled and replied, "Yeh . . . O.K. . . . ." Exhibit 1, Brief of Appellant.

Several days later Sewer and the appellee met again on a public street. On this occasion however, the appellee initiated the conversation saying "we ain't paying nothing, you all ain't got nothing on us, nobody ain't see me kill nobody[s'] cow." Mr. Sewer responded, "O.K., brother." Id.

At trial, counsel for the appellee moved to suppress each of the two statements made by Roberts to Sewer. The Court, ruling from the bench found, that neither of the two statements at issue were made voluntarily,[5] and therefore granted the motion on the basis of the self-incrimination clause of the United States Constitution (as interpreted through Miranda and its progeny) and, as an independ-

whether or not Sewer is a "law enforcement officer" within the meaning of Miranda. Although the lack of arrest powers on the part of Sewer is a factor to consider in determining whether Roberts had any reason to believe that his freedom of action was restrained or whether his statements were otherwise coerced, the courts have generally held that a government agent without arrest authority who nevertheless acts in concert with or at the request of police authorities assumes the status of a "law enforcement officer" for purposes of the Miranda requirements. See, e.g., People v. Faulkner, 282 N.W.2d 377 (Mich. Ct. App. 1979) (director of half-way house); Commonwealth v. Anderson, 385 A.2d 365 (Pa. Super. 1978) (coroner).

[4] The Order excluding the statements made by Brady is not challenged by the Government in the present appeal.

[5] The trial Court ruled that the second unsolicited statement was derived from the impermissibly obtained first statement, and therefore inadmissible on the same basis. Hearing Transcript, 63.

ent ground, the analogous prohibition on self-incrimination contained in the Bill of Rights section (Section 3, paragraph 3) of the Revised Organic Act of the Virgin Islands. It is from that Order which the Government prosecutes the instant appeal.

The question presented for decision is whether or not the trial Court was "clearly erronerous" as a matter of law in excluding on the basis of the prohibition against compelled self-incrimination,[6] the statements of Ray Roberts, made under the circumstances described above. Having carefully reviewed the hearing transcript and the submitted briefs we conclude, for the reasons set forth below, that the order to suppress should be reversed.

## DISCUSSION

A) *The Miranda and Fifth Amendment Grounds*

██ The starting point for any discussion of "voluntariness" in the self-incrimination context is, of course, Miranda v. Arizona, supra. The Miranda Court held that the self-incrimination clause contained in the Fifth Amendment to the U.S. Constitution[7] prohibits the use in a criminal trial of "statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant . . . . By custodial interrogation, we mean questioning initiated by *law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."* Id. at 445 (emphasis added).

Not surprisingly, the Supreme Court has been periodically called upon to further define the precise point in a criminal investigation at which the rights and duties set forth in Miranda are to be implicated. In Beckwith v. United States, 425 U.S. 341 (1976) agents of Internal Revenue Service investigating possible criminal income tax violations on the part of the defendant, arranged to meet with the defendant in a private home. Upon their arrival, the agents identified themselves, presented their credentials and before they began

---

[6] Appellee has argued that his statements should be excluded from evidence on the basis of the Fifth Amendment as well as the Sixth Amendment's guarantee of assistance of counsel. However, the right to assistance of counsel attaches only after "a formal charge against the defendant has been filed." Rhode Island v. Innis, 446 U.S. 291 at 300 n.4 (relying on Massiah v. United States, 377 U.S. 201, 206 (1964)). Inasmuch as the challenged statements in this case were made prior to the filing of any formal charge, the protections of the Sixth Amendment are inapplicable.

[7] Made applicable in the Virgin Islands by Section 3 of the Revised Organic Act of 1954, as amended.

their questioning read to the defendant some but not all of the warnings required by the Miranda rule. The defendant acknowledged that he understood his rights, and thereupon answered the agents' questions. Subsequently, upon the request of one of the agents, the defendant permitted the agents to inspect certain of his financial records. Prior to his trial on income tax related charges, the defendant moved to suppress all the statements he had made to the agents and the evidence derived therefrom on the ground that the complete warnings mandated by Miranda had not been given.

The Court assumed that the warnings given to Beckwith were inadequate under the terms of Miranda, and so it was squarely faced with the question of whether a person who is the focus of a criminal investigation but not in custody must be given the warnings called for by Miranda. "An interview with Government agents such as the one shown by this record," the Court concluded, "simply does not present the elements which the Miranda Court found so inherently coercive as to require its holding." Id. at 347. The Court expressly rejected the argument of the defendant that even though his statements had been made in noncustodial surroundings, the "confusion on the part of taxpayers between the civil and criminal function of the Internal Revenue Service," had him placed under "psychological restraints which are the functional . . . equivalent of custody." Id. at 345. Similarly, the fact that the defendant had become the "focus" of an investigation, did not amount to the kind of custody contemplated by the Miranda rule. The Court, quoting the Court of Appeals for the Second Circuit stated as follows:

> It was the compulsive aspect of custodial interrogation, and not the strength or content of the government's suspicions at the time the questioning was conducted, which led the court to impose the Miranda requirements with regard to custodial questioning. Id. at 346–47, quoting United States v. Caiello, 420 F.2d 471, 473 (2nd Cir. 1969).

Although the Court rejected the notion that the "psychological restraint" had amounted to coercive police custody in Beckwith's case, it nevertheless acknowleged that "non custodial interrogation might possibly in some situations, by virtue of some special circumstances, be characterized as one where 'the behavior of . . . law enforcement officials was such as to overbear petitioner's will to resist and bring about confessions not freely self-determined . . .' Rogers v. Richmond, 365 U.S. 534, 544 (1961)." Id. at 347–48.

A more recent elaboration on the countors of "custodial interroga-

tion" within the context of Miranda came in Oregon v. Mathiason, 429 U.S. 492 (1977). In this case, a State Police officer assigned to investigate a theft at a private residence, had asked the burglary victim if she suspected anyone of the crime. She replied that the defendant was the only one she could think of. The officer then tried to contact the defendant by leaving a note at defendant's home asking him to call. The following day the defendant did call and having expressed no preference for a meeting place, arranged to be interviewed at a state patrol headquarters near his home.

Defendant arrived at the appointed hour and was taken into an office. He was told that he was not under arrest. The officer told defendant he wanted to talk about a burglary and that his truthfulness might be favorably considered by the prosecutor or judge. The officer further advised him that the police believed defendant was involved with the burglary and falsely stated that the fingerprints of defendant has been found at the scene. The defendant sat for a few minutes and then confessed to the burglary. The officer then advised defendant of his rights in accordance with Miranda, and had defendant repeat his confession into a tape recorder microphone.

The United States Supreme Court in a per curiam opinion, held that because the incriminating statements were made "in a context where [defendant's] freedom to depart was [not] restricted in any way," Id. at 495, the requirements of Miranda were not implicated and such statements could therefore be properly admitted in evidence. The Court stated that the obligations of Miranda do not attach unless a suspect is in custody or "otherwise deprived of his freedom of action in any significant way." Id. quoting Miranda v. Arizona, supra at 444. The Court (implicitly restating its position in Beckwith) held that regardless of the techniques employed to solicit incriminating statements, the preliminary inquiry in such cases is whether or not the suspect is "in custody for purposes of the Miranda rule." Id. at 496. The Court explained as follows:

> Such a noncustodial situation is not converted to one in which Miranda applies simply because a reviewing court concludes that, even in the absence of any formal arrest or restraint on freedom of movement, the questioning took place in the "coercive environment." Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. But police officers are not required to administer

Miranda warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect. Miranda warnings are required only where there has been such a restriction on a person's freedom as to render him "in custody." It was that sort of coercive environment to which Miranda by its terms was made applicable, and to which it is limited.

Id. at 495.

Our own Third Circuit Court of Appeals has also recently grappled with the definition of "custodial interrogation" for purposes of the Miranda rule. In United States v. Mesa, 638 F.2d 582 (1980), the defendant had barricaded himself inside a motel room after shooting and wounding his wife and daughter. Armed with an arrest warrant, FBI agents surrounded the motel, and called to defendant through a bullhorn to surrender himself. This effort proved to be unsuccessful, and so an FBI agent, specially trained as a hostage negotiator, was called to the scene. The negotiator and the defendant conversed by phone for over three hours during which time the conversation was recorded. At no time during the taped conversation were the warnings mandated by Miranda provided. At a pretrial hearing on the motion of defendant to suppress the contents of the taped conversation, the district court held that the conversation must be suppressed because the FBI agent's phone call to the defendant constituted "custodial interrogation" within the meaning of Miranda.

On interlocutory appeal to the Court of Appeals, the order to suppress was reversed. The Court, through Chief Judge Seitz, explained that "to determine whether there has been a 'custodial interrogation', a court must make two discrete inquiries—First, it must determine whether the suspect was in 'custody'. . . . If the suspect was in 'custody', the Court then must decide whether the police interrogated him." Id. at 585. After carefully reviewing the Miranda doctrine, the Court found that in the case before it the first requirement of the two-pronged test had not been met and that it was therefore unnecessary to reach the question of whether the phone conversation constituted an "interrogation" within the meaning of Rhode Island v. Innis, 446 U.S. 291 (1980).

Although it acknowledged, on the basis of Orozco v. Texas, 394 U.S. 325 (1969), that a custodial setting could exist outside the police station, the Court concluded that the rationale of Miranda was pre-

mised on the "fact that in-custody interrogation takes place in private . . . ." Id. at 585. The Court stated as follows:

> The evils inherent in the custodial setting [described in Miranda] were the secrecy involved, the fact that the interrogator was alone with the suspect and thus could employ any number of subtle psychological pressures, and the fact that the suspect's will was much more likely to be worn down when he was interrogated while alone in an atmosphere controlled by the police. Therefore, the key aspect of the custodial setting, as described in Miranda is the isolation of the suspect in a room that is dominated by the law enforcement officials who will interrogate him. In this setting, the police have immediate control over the suspect, they can restrain him and subject him to their questioning and apply whatever psychological techniques they think will be most effective. As the Court noted, "[a]n individual swept from familiar surroundings into police custody, surrounded by antagonistic forces, and subjected to the techniques of persuasion described above cannot be otherwise than under compulsion to speak." Id. at 461.

Id. at 585–86.

Inasmuch as the defendant in Mesa could not be restrained or controlled by law enforcement officers, or compelled to listen to any of their questions the Court held that "custody" had not materialized, so to speak, and that the reading of Miranda warnings was therefore not required.

■■ The foregoing decisions make clear that it is only under circumstances where there is an actual or a reasonably perceived restraint of the defendant's freedom of movement that the Miranda warnings are required. In the instant case there was no evidence that Roberts' freedom of action was in any way limited or that Roberts could have reasonably believed that his freedom was so restricted. This is not a case moreover where the defendant was rendered incommunicado or placed into a police dominated or "inherently coercive" environment. The record indicates that the first conversation between Sewer and Roberts occurred while defendant was sitting in the driver's seat of a vehicle momentarily stopped on a public thoroughfare. There was no evidence that defendant was ordered to stop his vehicle or that he was unable to drive away. At no time during either of the two encounters at issue did Sewer either explicitly or implicitly manifest an intent to restrain Roberts or confine him to a restricted or isolated area. Indeed the brief

informal contacts which occurred on a public street in daylight, constitute less of "custodial setting" than even the at-home interview in Beckwith, the station house conversation in Mathiason or the motel stake-out in Mesa. Because the definition of "custody" contemplated by the Miranda decision requires "that as a minimum, the police have *immediate control* over the suspect," United States v. Mesa, supra at 587 (emphasis added), we conclude that neither of the conversations at issue in the present case occurred in an in-custody setting which thereby required a recitation of the warnings set forth in Miranda v. Arizona.

A finding that incriminating statements were made outside the "custodial setting" does not, however, end the Constitutional inquiry. See, e.g., United States v. Curtis, 568 F.2d 643, 647 (9th Cir. 1978). The Court below concluded that even if the statements of Roberts were found to have been obtained before Miranda warnings were required, they were nevertheless, obtained involuntarily, thus bringing the case within the "special circumstances" exception recognized in Beckwith, supra.[8]

The record reflects that the defendant and Sewer are cousins and have maintained a life long acquaintanceship. The trial court found that Sewer relied upon this acquaintanceship, if not the familial ties in inducing the incriminating statements. The court found more generally that the different "hats" which Sewer "wore" during his encounters with Roberts engendered a confusion on the part of the defendant which in turn lead to the inculpatory remarks.[9] From these facts, the trial court concluded that Sewer either intended or should have known that his comments would be likely to induce an incriminating response and, that in light of Rhode Island v. Innis, 446 U.S. 291 (1980),[10] those statements should be excluded as involuntarily obtained.

---

[8] The trial Court expressly based its ruling upon the "special circumstances" language contained in Beckwith v. United States, supra. Hearing Transcript, 74–75.

[9] The Court stated as follows:

... how is Mr. Roberts supposed to know, is he talking to me as my cousin? Is he talking to me as one who is trying to mediate a dispute or is he talking to me as the interrogator. How does he know? ... [Y]ou can't be mediator and interrogator at the same time. If you are going to be both, you better tell somebody when you are playing each. Hearing Transcript, at 55–56.

[10] The issue in Innis was not whether the defendant was in custody—that was admitted—but rather whether the inculpatory statements were made in response to "interrogation" as defined by Miranda. Thus the focus in Innis on "words or actions ... that the police should know are reasonably likely to elicit an incrimi-

■■ "When deciding a voluntariness claim, a court must consider all the circumstances surrounding the incriminating statements including the age and mental state of the suspect." United States v. Mesa, supra at 589. None of the cases which address a voluntariness claim in circumstances which fall outside the scope of the Miranda requirements turn upon "the presence or absence of a single controlling criterion, each reflect[s] a careful scrutiny of *all the surrounding circumstances."* Johnson v. Hall, 605 F.2d 577, 581 (1st Cir. 1979) (emphasis added). The test of voluntariness to be applied to the totality of circumstances has been stated as follows:

> Whether the behavior of the law enforcement officer who elicited the statement from the defendant was such as to *overbear his will to resist* and bring about a confession not freely self-determined.

United States v. Hackley, 636 F.2d 493, 499 (D.C. Cir. 1980) (emphasis added).

Applying the analysis set forth above to the present case, we must conclude that as a matter of law, the statements at issue were not obtained involuntarily. The familial relationship between Sewer and Roberts and the fact that the defendant may have been uncertain about the scope of Sewer's official duties do not by themselves indicate that defendant's free will was "overborn". There was no evidence for example that Roberts possessed a low intelligence or that for reasons of age was abnormally vulnerable to the suggestions of a government agent. Whether Sewer approached defendant as a government officer or as a relative is, in this case, of little consequence. Considering that Sewer's duties included those of a community mediator his statement that Roberts and the co-defendants were "in trouble" with Mr. Smith and that Smith wanted "restitution" was not only legally authorized, it evidences a complete absence of any bad faith effort to induce or trick the declarant into making a confession. It was not after all, a threat of prosecution or of punishment which Sewer recited but merely a suggestion that the victim be compensated.

---

nating response," 446 U.S. at 301, is not strictly speaking, applicable to the non-custodial encounter at issue in the present case.

Similarly, People v. Bodner, 430 N.Y.S.2d 433 (App. Div. 1980) which was cited approvingly by trial Court upheld the suppression of certain statements but under circumstances where the defendant was inside a police station. Indeed, the Court in Bodner allowed the admission of separate inculpatory statements "because there is insufficient evidence that [the defendant] was in custody during this period." Id. at 437.

207

Another consideration to take into account in the calculus of voluntariness is the fact that the encounter between Sewer and Roberts occurred prior to the time that the latter actually became the focus of a criminal investigation initiated by either the Departments of Law or Department of Public Safety. It is true that for purposes of the Miranda requirements the relevant inquiry is not solely whether a suspect is the focus of an ongoing investigation but, as well, and more importantly, whether the suspect is in "custody". Beckwith v. United States, supra, 346–47; Moore v. Ballone, 658 F.2d 218, 225 (4th Cir. 1981). However, a voluntariness claim apart from the Miranda rule, is not to be subject to the most exacting scrutiny where, as in the instant case, the alleged coercion occurs prior to the time that the investigative machinery of the government has even begun to direct itself toward the conviction of the declarant or for that matter, of any other person. While not all statements made by a suspect in advance of the accusatory stage of a criminal proceeding are presumed to have been obtained voluntarily, the claim of coercive police tactics is in this case substantially weakened by the fact that Sewer's contacts with Roberts occurred prior to the filing of a criminal complaint and prior to the initiation of an "official" investigation.

■■ The appellee also urges that the absence of "some kind of warnings" to the declarant even under circumstances where he is not in custody or otherwise the focus of a criminal investigation, may be "relevant evidence . . . on the issue of whether questioning was in fact coercive." Beckwith v. United States, supra at 348. Sewer testified that he has been instructed to recite the Miranda warnings where he confronts a suspect after having "been assigned to investigate a particular [criminal] complaint." Hearing Transcript at 28. This is a very prudent practice and we by no means wish to suggest that investigators for the Department of Law should deviate from it. Even when an investigator or complaint officer makes an "informal" approach to one he suspects of a criminal act, the cautionary warnings mandated by Miranda ought to be recited in order to assure that any responses to his inquiries are made in a manner entirely free from the taint of coercion. However, viewing all of the circumstances present in this case—the public, noncustodial encounter at issue, the good faith effort to resolve a dispute between private citizens and the lack of any on-going criminal investigation—we conclude that the acts and omissions of the government agent, including his failure to administer some or all of

the Miranda warnings, did not amount to the type of psychological trickery or subtle coercion which the self-incrimination clause forbids. For the foregoing reasons the Order of the Territorial Court will be reversed insofar as it relied upon Miranda v. Arizona and upon the Fifth Amendment.

B) *The Organic Act Grounds*

The trial Court rested its Order to suppress on a basis independent of the U.S. Constitution, namely the self-incrimination clause contained in paragraph 3, Section 3 of the Revised Organic Act of the Virgin Islands (codified at 48 U.S.C. § 1406g). Section 3 of the Revised Organic Act contains a Bill of Rights which vouchsafes rights and privileges paralleling in large degree those which are guaranteed by the U.S. Constitution. Paragraph 3, for example, tracks the language found in the Fifth Amendment to the Constitution,[11] including the provision implicated in the present appeal, the self-incrimination clause. The self-incrimination clauses contained in the federal and the Virgin Islands Bills of Rights are phrased identically except that while the Fifth Amendment states that "no person shall be compelled to be a witness against himself," Section 3 of the Revised Organic Act states that no person may be compelled to *"give evidence against himself"* (emphasis added). It is this difference in phrasing which the trial Court found significant and on which it based its holding that the Organic Act by itself extends the requirements of Miranda to statements obtained from a criminal suspect in a noncustodial situation.

██ ██ It is a well settled principle of Constitutional adjudication that "a state is free as a matter of its own law to impose greater restrictions on police activity than those [the United States Supreme] Court holds to be necessary upon federal Constitutional standards". Oregon v. Hass, 420 U.S. 714, 719 (1975).[12] Similarly,

---

[11] The provisions contained in the Fifth Amendment are set forth in the following order: the grand jury clause, the double jeopardy clause, the self-incrimination clause, the due process clause and the just compensation clause. The analogous paragraph 3 of Section 3 of the Revised Organic Act sets forth its protection in the following order: a due process clause, a double jeopardy clause, a self-incrimination clause and a provision dealing with the recusal of judges and magistrates.

[12] For example, in the wake of the holding of the U.S. Supreme Court in Harris v. New York, 401 U.S. 222 (1971) that the Miranda requirements did not extend to statements offered at trial solely for impeachment purposes, several state courts "marched to the sound of a different drummer" heard to emanate from within their own state constitutions or their own statutory rules of evidence. See, e.g., People v. Disbrow, 16 Cal. 3rd 101, 113, 545 P.2d 272, 280, 127 Cal. Rptr. 360, 368

nothing in the Constitution prohibits the United States Congress from acting on the basis of an interpretation of the Bill of Rights which is more expansive than that required by the Supreme Court as a matter of minimum protection. Katzenbach v. Morgan, 384 U.S. 641 (1966). See, also, L. Tribe, American Constitutional Law, 29 (1978). It is the latter situation which is implicated in the present case, the trial court concluding that an applicable measure enacted by the United States Congress—the Revised Organic Act of the Virgin Islands—provides a more expansive privilege against compelled self-incrimination than that contained in the Constitution as interpreted by the United States Supreme Court.[13]

There is no doubt that Congress in exercising its authority to enact legislation on behalf of the United States territories, U.S. Constitution, article IV, § 3, may in its discretion expand upon the Constitutional standards which the Supreme Court has held are required at a minimum. In the present case, however, we are unpersuaded that the self-incrimination clause contained in the Revised Organic Act reflects a more far-reaching grant of the privilege than that contained in the U.S. Constitution. The legislative history of the Act reveals no specific reference to the clause at all. Indeed the only reference in the legislative history to the Bill of Rights for the Virgin Islands is the observation contained in the Senate Report that "Section 3 [of the Act] provides a bill of rights which is in part similar to the Bill of Rights in the United States Constitution and which parallels the bill of rights, in somewhat different order contained in the existing Virgin Islands Organic Act [of 1936]."[14] S. Rep. No. 1271,

---

(1976) (identically phrased self-incrimination clause in California Constitution held to extend Miranda requirements to all statements offered at trial); and Butler v. State, 493 S.W.2d 190, 198 (Tex. Cr. App. 1973) (holding of Harris v. New York, inapplicable where a state statute set forth Miranda type requirements for all statements offered at a criminal trial).

[13] The limitations on the Miranda rule imposed by Harris v. New York, supra, were not only found to contradict the more generous testimonial privileges provided by certain states. In the case of United States v. Jordon, 20 U.S. M.A. 614, 414 C.M.R. 44 (1971), the U.S. Court of Military Appeals held that Harris was inapplicable in the face of a more expansive grant of the self-incrimination privilege afforded by Congress through the Manual for the Courts-Martial.

[14] The phrasing of the self-incrimination clause in the 1954 Act is identical to that contained in the original 1936 Act. But the legislative history of the original Organic Act is similarly barren with respect to the clause or its slight variation in wording from the parallel provision of the Constitution. The Bill of Rights contained in Section 34 of the 1936 Act, was simply mentioned by the sponsor of the proposed Organic Act as setting forth "familiar provisions found in various organic acts and in State constitutions. . . ." 80 Cong. Rec. 6603, 6609 (1936) (Statement of Sen. King).

210

83rd Cong., 2d Sess., *reprinted in* 1954 U.S. Code Cong. & Ad. News 2585 at 2593. The statement that Section 3 of the Revised Organic Act is similiar "in part" to the Bill of Rights in the U.S. Constitution merely reflects the fact that certain provisions of the latter (such as the grand jury clause) are not included in the former. Finally, the amendments to Section 3, enacted by Congress in 1968 to assure that certain Constitutional guarantees apply to the Virgin Islands "to the extent that they have not been previously extended," provide no basis upon which to glean a Congressional intent to confer a self-incrimination privilege broader than that contained in the Fifth Amendment. See Pub. L. 90–496, 311, 82 Stat. 841 (1968); and H.R. Rep. No. 1522, 90th Cong., 2d Sess., *reprinted in* 1968 U.S. Code Cong. & Ad. News 3548, 3553.

■ In short, although the Revised Organic Act of the Virgin Islands as amended "expresses the Congressional intention to make the federal Constitution applicable to the Virgin Islands to the fullest extent possible," In re Brown, 8 V.I. 313 at 318, 439 F.2d 47 at 50–51 (1971) we are unable to find any functional difference for purposes of the self-incrimination privilege, between the words "evidence" and "witness". Inasmuch as the source of the Fifth Amendment's self-incrimination clause was the English common law maxim that "no man is bound to *accuse* himself" (memo tenetur seipsum accusare), see, Brown v. Walker, 161 U.S. 591, 596 (1896), it is safe to assume that in considering inclusion of a self-incrimination clause in a Bill of Rights for the Virgin Islands, Congress used the words "witness" and "evidence" interchangeably; the key to the protection lying in the prohibition against any compelled incrimination, regardless of its form. While use of the word "evidence" might suggest that the self-incrimination protection contemplated by the sponsors of the Organic Act was to attach at a stage prior to the formal filing of charges, it is already the case under existing Fifth Amendment law that the ban on compelling a person to be a "witness against himself" is implicated "outside of criminal court proceedings" and in "all settings in which [his] freedom of action is curtailed." Miranda v. Arizona, supra at 467.

■ There is finally, the question of Congressional silence with respect to the slight alteration of Fifth Amendment language which appears in the two Organic acts. The complete omission of any legislative explanation for this variation in phrasing in a section otherwise intended to be "a bill of rights in familiar form," S. Rep. No. 1974, 74th Cong., 2d Sess. at 3 (1936), is reason enough for us to give

pause before undertaking to construe our locally applicable self-incrimination clause more broadly than the Supreme Court has construed the parallel federal provision. "The interests of uniformity in the development of basic principles of constitutional law . . . together with the deference that is due pronouncements of the Supreme Court of the United States, indicate [] that . . . [state and territorial courts] should chart a separate course only where compelling reasons for doing so are advanced." Commonwealth v. Triplett, 341 A.2d 62, 66 (Pa. 1975) (Pomeroy, J. concurring). Because we fail to discern such "compelling reasons" either in the legislative history or from the plain meaning of paragraph 3, Section 3 of the Revised Organic Act as amended, we conclude that the trial Court erred as a matter of law in holding that the self-incrimination clause contained therein provides a basis on which to exclude from evidence at a criminal trial incriminating statements obtained from a defendant under the circumstances present in the instant case. Accordingly, the Order to suppress will be reversed in its entirety, and the case remanded for trial.