The People of the State of New York, Respondent, v Alfio Ferro, Appellant.

Second Department, March 21, 1983

**APPEARANCES OF COUNSEL**

*Anthony V. Lombardino* for appellant.

*John J. Santucci, District Attorney* (*William Schrager* of counsel), for respondent.

**OPINION OF THE COURT**

Thompson, J.

Lillian Sher, an elderly woman living alone in her one-family attached house in Forest Hills, was confronted by burglars who entered her abode on December 5, 1975 to take her property. The invaders vacated the residence only after subduing their innocent victim and looting the premises. Her lifeless body, bound hand and foot, was not discovered until December 11. The piece of cloth stuffed into her mouth to stifle any potential cries for help also cut off her oxygen supply and caused her asphyxiation.

Alfio Ferro, the 58-year-old proprietor of a used furniture store in Manhattan, with no obvious connection to Sher, was arrested by Detective Robert Hudson on December 12 in front of his store and was informed his arrest was for murder. Arrested along with Ferro was Thomas Lewis, Ferro's employee. Lewis had a substantial criminal record, and Ferro had been arrested in both August, 1975 and November, 1975 for criminal possession of stolen property. Detective Hudson told Ferro to keep quiet and not make any statements. Transported back to the 106th Precinct along with Ferro and Lewis was Wanda Feliciano, a 17-year-old employee of Ferro's. Feliciano was an admitted lesbian who conceded during her trial testimony that at one time she had swallowed one quarter of a bottle of ammonia, and several days later had been taken to the hospital after consuming six Tuinals. She also acknowledged other drug usage. Detective Hudson and his group arrived at the precinct at about 3:00 P.M.

When Ferro was brought to the precinct, Detective Arnold Hendricks identified himself to Ferro and informed Ferro that he had been arrested for the Sher homicide. Hendricks gave Ferro his *Miranda* rights and Ferro stated that he understood them. When Ferro was asked if he was willing to answer questions without an attorney being present, his response was "No". Ferro did not ask for an attorney. He was then placed in a detention cell.

After spending approximately four and one-half hours in the cell, an ample amount of time to reflect upon his situation, Ferro spontaneously asked Detective Hudson at about 7:30 P.M., "Can I speak to a D.A.?" Hudson informed him that the District Attorney had left and would have to be summoned to return. When asked what he wanted to say to the District Attorney, Ferro simply repeated his desire to speak to a District Attorney. Hudson explained that Ferro would have to tell him what he wanted to talk to the District Attorney about so the District Attorney could be advised, and that he would not come without this. In response to this Ferro "didn't say anything".

Detectives Hudson and Hendricks returned with Thomas Lewis to Lewis' apartment in Manhattan at about 8:30 P.M., and Lewis surrendered furs that had been stolen

during the burglary. Upon their return to the precinct at approximately 9:45 P.M., Hendricks put the furs down in front of Ferro's cell, "a foot away from him", after which he took Lewis to another area of the precinct. Hendricks candidly conceded that he did this "[f]or him to tell what happened".

At this point Ferro grabbed the mesh of the cell with both hands and told Hudson "I have to talk to a D.A.". Hudson again told him that a District Attorney would not come unless Ferro told him why he wanted him. Ferro responded "I will tell you guys what you want to know if the D.A. can do something for me". Hudson informed Ferro that neither he nor a District Attorney could do anything for him, at which point Ferro expressed his desire to speak to a "Pisano".

Detective Walter Cassi, who was not working on the Sher case, was told that Ferro wanted to speak to a "Pisano". Cassi identified himself to Ferro as an Italian, and when Ferro expressed a desire to speak with him, Cassi took him to a separate room. Ferro then stated "I can't afford to do a lot of time. What can I tell you?" Cassi instructed him that he would forward Ferro's information to the District Attorney, but what the District Attorney did was his business and no promises could be made. Ferro then stated that he had been introduced to Florence Freeman, who lived next to Sher, by a woman named Irish. Freeman complained to him that Sher had been giving her trouble and had once grabbed her by the neck. Claiming that Sher was "a nut and dirty", she expressed a desire to have Sher robbed. When Ferro told Freeman that he was not interested, she asked him if he could get anybody else and he told her he would think about it. When Cassi told Ferro that he had not told him anything relative to the investigation, Ferro told him "I just can't do a lot of time". At this point the interview terminated, and Ferro was taken to central booking about 10:00 P.M.

Following the denial of Ferro's motion to suppress the statements he made subsequent to viewing the furs, the matter proceeded to trial. The most damning testimony came from Wanda Feliciano who testified to Ferro's presence at the scene at the time of the commission of the crime

and to admissions made to her by Ferro. Following a lengthy, hotly contested trial, Ferro was convicted of felony murder.

On appeal Ferro posits a plethora of potential errors that warrant a new trial, but only one merits discussion. He argues that the placement of the furs in front of the cell constituted either a subtle form of psychological coercion or, in the alternative, the functional equivalent of questioning in disregard of his invocation of his *Miranda* rights. He asserts that the failure to suppress the ensuing statements constituted reversible error. For the reasons stated herein we do not agree, and affirm the judgment of conviction.

In *Rhode Island v Innis* (446 US 291, 300) the Supreme Court noted that " '[i]nterrogation,' as conceptualized in the *Miranda* opinion, must reflect a measure of compulsion above and beyond that inherent in custody itself." The court further refined the concept of interrogation as follows (p 301): "That is to say, the term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation."

In *Michigan v Mosley* (423 US 96), the Supreme Court also discussed the role played by the *Miranda* safeguards in counteracting the coercive pressure inherent in the custodial setting. The critical *Miranda* safeguard provides the defendant with the right to cut off questioning, thereby enabling him to control the timing of the questioning, its duration, and the subjects to be discussed (see, also, *People*

*v Grant,* 45 NY2d 366). The instant appeal must be analyzed within the foregoing context.

We note at the outset that if the intent of the police was dispositive, Detective Hendricks' concession that he put the furs in front of Ferro to elicit a response would mandate a reversal. Although this testimony is still somewhat probative as to whether the police should have known that this act was reasonably likely to elicit an incriminating response, the totality of the circumstances must be considered. Just as police good faith is not an acceptable excuse negating a violation of a defendant's *Miranda* rights, their dubious motivations herein cannot pre-empt this court from objectively evaluating whether their actions were reasonably likely to elicit an incriminating response.

The fact that a suspect views or learns of potential physical or other evidence against him does not lead to the inexorable conclusion that said viewing constituted subtle coercion or the functional equivalent of questioning (see *State v Grisby,* 97 Wn 2d 493; *People v Prator,* 93 Misc 2d 303). Were the rule otherwise, a unique and newly imposed burden would be saddled upon the police to shield a defendant from learning of any aspect of the case against him once he invokes his *Miranda* rights or before the *Miranda* rights are given and waived. So onerous and exacting a burden has not been demanded. Thus, in the case of *People v Baez* (79 AD2d 608), where the defendant was approached by an undercover officer he had sold drugs to and blurted out an inculpatory statement upon realizing what he had done, the utterance was found to be spontaneous and not in violation of his *Miranda* rights.

The fact that a statement is made because a suspect learns that the incriminating content of the statement will be discovered in any event does not mean that the statement was made as the result of compelling influences and was not spontaneous (*People v Torres,* 21 NY2d 49). Furthermore, not every provocative statement made by the police in a defendant's presence which elicits an incriminating response will be found to be improper, where there is no course of questioning or an interrogational environment (*People v Bryant,* 87 AD2d 873).

Within the framework of the foregoing and the unusual facts presented herein, we conclude that Ferro's response to seeing the furs was not the product of the functional equivalent of questioning or psychological coercion. When Ferro was arrested a full week after the crime was committed, he had to be troubled by the strong possibility that only a breach of the cabal that knew what really happened could have led the police to him. One can only surmise the anxiety level permeating Ferro's thought processes as he was returned to Queens with Lewis and Feliciano, realizing that the continued silence of a suicidal, drug-using lesbian and a small-time thug was all that stood between him and his final, immutable linkage to the Sher murder. Ferro was told to remain silent as soon as he was arrested, and his invocation of his *Miranda* rights was scrupulously honored.

After sitting in the cell long enough to contemplate the bleak future of a 58 year old convicted of a callous murder, Ferro teetered on the very edge of confession at 7:30 P.M. when he asked to speak to a District Attorney. Even at this point the police did not press their advantage and apply the slight nudge necessary to push Ferro into making the cathartic and potentially self-serving statement he was obviously contemplating. The police did not rush out and get an Assistant District Attorney who might obtain a confession before Ferro invoked his right to an attorney.

Approximately two hours later, Ferro saw the furs. They were not recovered from Ferro, and nothing inherent in the objects linked Ferro to the crime. As Ferro already realized, only the testimony of Lewis or Feliciano could connect him to the furs, and their testimony could condemn him even without the furs. The isolated viewing of the furs therefore constituted no more than an innocuous translation of the obvious into concrete terms. The subsequent inculpatory statements to Cassi, a detective completely unconnected with the case, must thus be viewed as the self-serving efforts of an aging criminal to spare himself the remainder of his life in captivity, and not the result of psychological coercion or police behavior reasonably likely to elicit an incriminating response. Our conclusion is bolstered by Ferro's compulsion to proceed with his story

despite the police refusal to offer him a deal, and by the fact that Ferro was permitted to terminate his story at a point where he characterized his conduct as innocent in nature. Police anxious to obtain a confession in disregard of a defendant's *Miranda* rights simply do not proceed in such a manner. We further note that Ferro was not an easily awed or intimidated novice in the criminal justice system.

In short, Ferro asks us to raise the concepts of psychological coercion and the functional equivalent of questioning to levels that are in no way necessary to fully afford the protections required by *Miranda v Arizona* (384 US 436). This we will not do. Accordingly, the judgment of conviction must be affirmed.

LAZER, J. P. (dissenting). The principal issue is whether the police action of placing the stolen furs in front of defendant's cell constituted the functional equivalent of interrogation. My colleagues conclude that the defendant's response on seeing the furs was not evoked by such interrogation. My disagreement stems from the fact that the defendant previously had invoked the right to remain silent; therefore — without reaching any issue as to the right to resume questioning — the failure to afford the *Miranda* warnings before the furs were placed requires suppression of the defendant's statement and a new trial. The issue is determined by evaluating the police conduct and not by speculative probing of the defendant's innermost psyche.

On December 12, 1975, Detective Robert Hudson arrested Alfio Ferro for murdering Lillian Sher while robbing her in her apartment. Ferro was brought to the 106th Precinct in Queens, heard his rights read, declared that he understood them, made no request for counsel but stated his unwillingness to answer questions. He was questioned no further.

Later in the day, while Ferro still was in a detention cell in the precinct's squad room, he asked Detective Hudson whether he could speak to the District Attorney. Hudson answered: "You have to tell me what you want to talk to him about so I can relate that to him. Otherwise, he won't come". Ferro resumed his silence.

That evening, after Mrs. Sher's furs had been recovered, another detective placed them a foot away from Ferro's cell. According to Hudson, who was then present, Ferro grabbed the mesh of the cell and said to him, "Hey, I got to talk to you" but when asked what it was he wanted to say, he responded: "I have to talk to a D.A.". Hudson told Ferro that "You have to tell me what you want or the D.A. won't come here; if you want to make a statement". Ferro then declared that he would "tell you guys what you want to know if the D.A. can do something for me". Hudson said that neither he nor the District Attorney could do anything for him.

Within 15 minutes after his conversation with Hudson, Ferro asked to speak with a "Pisano" which resulted in a conversation with Detective Walter Cassi at the cell. Cassi asked Ferro if he wanted to say something and upon receipt of an affirmative reply took him into an office where Ferro asserted that he could not afford to do a lot of time. He then related a discussion he had had with Sher's next door neighbor, Florence Freeman. The relations between Freeman and Sher had been troubled, and since Freeman thought Sher was wealthy, she wanted her robbed. Although Ferro professed lack of interest in a robbery, he told Freeman that he would think about finding someone to do it. Cassi informed Ferro that he had not said anything relative to the investigation and that he could not make any promises, to which Ferro reiterated that he could not do a lot of time and the conversation ended.

On this factual scenario, the Fifth Amendment is the only issue and it scarcely bears repetition to note that to safeguard the Fifth Amendment privilege against self incrimination, the warnings required under *Miranda v Arizona* (384 US 436, 471) are "an absolute prerequisite to interrogation". Statements obtained by custodial interrogation or its functional equivalent, but not preceded by *Miranda* warnings, are not a true product of free choice and are per se inadmissible in evidence (see, generally, Note, Invocation of Miranda Rights: A Question of Fact? *Fare v. Michael C.*, 21 BC L Rev 922). Custodial interrogation includes that which is psychologically oriented, and it

is axiomatic that interrogation must cease if, in any manner, either prior to or during questioning, the individual indicates that he wishes to remain silent (*Miranda v Arizona, supra,* p 448). Any statement taken after the person invokes his privilege cannot be other than the·product of compulsion, subtle or otherwise (*Miranda v Arizona, supra,* p 474).

In *Rhode Island v Innis* (446 US 291), the Supreme Court construed *Miranda* as applicable not only to express questioning but to the "functional equivalent" of questioning as well. Limiting the scope of *Miranda* to express questioning would (p 299, n 3) " 'place a premium on the ingenuity of the police to devise methods of indirect interrogation, rather than to implement the plain mandate of *Miranda*' ". In addition to express questioning, interrogation was defined as including (*supra,* p 301) "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect."

The functional equivalent of questioning encompasses "any remarks, psychological tactics or patient maneuvering" employed to undermine the individual's will to resist (*People v Faison,* 78 Ill App 3d 911, 913). Confronting an accused with incriminating evidence is a tactic frequently employed to induce a confession (*United States v Barnes,* 432 F2d 89; Kamisar, *Brewer v. Williams, Massiah,* and *Miranda*: What is "Interrogation"?, When Does it Matter?, 67 Geo LJ 1). Here, the confrontation for the obvious purpose of getting the defendant to abandon his self-imposed silence was a flagrant violation of *Miranda* (*United States v Barnes, supra,* p 91). *People v Bodner* (75 AD2d 440, 443) is illustrative, for there, where defendant sought to inculpate his cousin as the arsonist, the police declaration to the defendant that the cousin's alibi had "checked out" was considered the equivalent of questioning and — since no warnings had been given — suppression was required. In *People v Lange* (77 AD2d 632, 633), an officer's comment in the charged atmosphere of the rescue of a rape defendant from an agitated crowd that it " 'was lucky [the defendant] didn't get killed' " was held to subject the defen-

dant to " 'questioning or its functional equivalent' ". Other examples of the functional equivalent include the recitation of strong evidence against the suspect (*People v Grant,* 45 NY2d 366; *People v Pugh,* 70 AD2d 664), a conversation between police officers concerning defendant's ignorance of the brand name of a stolen television set "within earshot of defendant" (*People v Tirado,* 79 AD2d 907, 908), disclosure of polygraph test results to the suspect (*State v Godfrey,* 131 NJ Super 168), and a conversation regarding the death penalty as defendant's fate (*State v Emery,* 131 Ariz 493).

Notwithstanding the majority's focus on the defendant's psychological reactions to his plight, and even his thought processes and perceptions, the proper focus of the "functional equivalent of interrogation" standard relates to the propriety of police conduct — "words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response" (*Rhode Island v Innis,* 446 US 291, 302, *supra*). The cases cited by the majority, *People v Prator* (93 Misc 2d 303) and *State v Grisby* (97 Wn 2d 493), involved apparently coincidental viewings of evidence by the defendant during administrative duties routinely being carried out. Here, however, there was no reason to place Mrs. Sher's furs in front of Ferro's jail cell except to break his silence or elicit an incriminating response. Moreover, since Detective Hendricks admitted that the tactic was designed to elicit an incriminating response, it is highly unlikely that "the practice will not also be one which the police should have known was reasonably likely to have that effect" (*Rhode Island v Innis, supra,* p 301, n 7). While the furs might legitimately have been used for interrogation had the defendant not invoked his right to remain silent, their use as a psychological weapon to overcome that silence or to evoke an incriminating statement, without a fresh set of warnings, was palpably improper (see *Michigan v Mosley,* 423 US 96; *People v Pugh, supra,* p 666).

Accordingly, I vote to reverse, grant the motion to suppress the statements in question, and order a new trial.

Mangano and Weinstein, JJ., concur with Thompson, J.; Lazer, J. P., dissents and votes to reverse the judgment,

grant the defendant's motion to suppress and order a new trial, with an opinion, in which GIBBONS, J., concurs.

Judgment of the Supreme Court, Queens County, rendered May 25, 1977, affirmed.