*342 OPINION OF THE COURT
Rena K. Uviller, J.
The defendant is a 15-year-old girl charged with arson, attempted murder and murder. It is alleged that in an effort to kill her parents, she set a fire in their home that caused the death of a neighbor’s child who was trapped in the burning house. She has moved to suppress oral, written and video taped confessions made at the police precinct in her father’s presence shortly after the fire. The People have conceded that earlier statements made to officers at the fire scene without Miranda warnings are inadmissible.
The motion raises the specific issue of whether notice to this young suspect’s father and his presence during the interrogation satisfied Criminal Procedure Law requirements concerning the questioning of alleged juvenile offenders. Defendant argues that her father’s status as an intended victim required that a special guardian be appointed for her before the police questioned her. The broader issue raised by this tragic case concerns the rights and duties of parents whose children have been charged with serious crime.
Testimony at the Huntley hearing reveal that Mr. and Mrs. H. are Susan’s adoptive parents. Susan and her older biological brother came to the H.’s as foster children when Susan was three and one-half years old and were legally adopted by them when Susan was seven. Prior to that, Susan had been either abandoned by or taken from her drug addicted mother and had already had three other foster placements. Susan has not seen her biological mother since she was very small. The H.’s are her family. They have, as well, a younger adopted son who is no blood relation to Susan.
The H.’s and particularly Mr. H. are well spoken and intelligent. They seem somewhat rigid or old-fashioned and elderly to have so young a daughter. But they appear to be motivated parents who have made efforts to provide Susan and her brothers with a physically comfortable home and a good education. To them, perhaps unrealistically, Susan appeared to be an untroubled child until the *343 age of 14. At that point she entered a period of pronounced adolescent stress. She was expelled from parochial school, was truant from public school and began staying out very late at night, occasionally disappearing altogether on weekends. She quarreled with her parents about her irregular school attendance and smoking and was envious of her younger brother.
On the morning of April 8,1983, Susan and her parents quarreled about her being late for school. As Susan was leaving the house she allegedly lit her cigarette lighter to a sofa and to some clothing, which caused the single-family frame house to be engulfed quickly by flames. At the time, her father was in his bedroom, her mother was doing the laundry in the basement and the child who perished was sleeping in the living room. The parents managed to escape and to save another child who was in the house but were unable to rescue the sleeping child.
When Susan left the house she went about the neighborhood telling various neighbors what she had done. She said that she had set the fire because she hated her parents and that her father had been sexually molesting her. Shé described the objects she had lit and displayed the lighter she had used. One neighbor detained Susan and took her to police officers and a fire marshal who were gathered on the street, reporting Susan’s admissions to them. Although Susan concededly was in custody at that point, the fire marshal did not give her Miranda warnings. Instead, he asked her to accompany him into the house and to explain how she had started the fire. She obliged, repeating that she had started the fire because she was angry with her father.
Shortly afterward, Detective Edward Miller arrived. He physically shielded Susan from the press and hostile neighbors who were gathered at the scene and drove her to the precinct. Her father followed in another police car. The detective was told only that Susan had admitted starting the fire, but not her reason.
On the way to the precinct Susan and the detective each recalled that they had met one another in a friendly *344 encounter about a month earlier. Miller also gave Susan her Miranda warnings, but being aware that she was a juvenile he advised her to say nothing until her father arrived. At the station house, Detective Miller again shielded her from enraged neighbors who had gathered there and took Susan to a special room designated for juvenile questioning. They were joined immediately by Mr. H.
At that time Detective Miller again read the Miranda warnings to Susan, this time in her father’s presence. Each acknowledged that they understood Susan’s rights and Susan said she was willing to speak. It is clear from Mr. H.’s hearing testimony that he had fully understood the consequences of his daughter making a statement but believed that as long as the questions were designed to reveal the truth, she should answer them. Mr. H. also acknowledged at the hearing that although he was with Susan during the entire precinct interrogation, he did not confer with her or counsel her. He was depressed over the tragedy that had just occurred, was aware that Susan had already admitted everything to the neighbors, and believed that the matter was “now in the hands of the Lord”.
In Susan’s oral statement to Detective Miller, which lasted about 10 minutes and was also reduced to writing, she recounted the quarrel of that morning with her parents and that she had lit various objects with her lighter because she hated them and her brother. A couple hours later an Assistant District Attorney took the video taped statement from Susan. It, too, lasted 10 minutes and in it Susan and her father are observed being advised of her Miranda rights once again and acknowledging their comprehension. Susan appears somber, composed and somewhat sullen. She is observed sitting some feet apart from her father, who appears weary and dejected. Father and daughter make no eye or other contact with one another and Susan again relates the argument of that morning and its aftermath, acknowledging also that she has already told numerous neighbors what she had done. In the very last moments of the film Susan is asked why she started the fire, to which she responds by glancing over at her father and saying, “Why? I hate them.”
*345 RIGHTS OF YOUNG SUSPECTS
Both the New York Family Court Act and the Criminal Procedure Law reflect our Legislature’s concern that when very young people are arrested, they may be in need of parental guidance and support during police interrogation. (Bellacosa, Practice Commentary, McKinney’s Cons Laws of NY, Book 11A, CPL 120.90, p 154; Sobie, Practice Commentary, McKinney’s Cons Laws of NY, Book 29A, Family Ct Act, art 3, p 258 et seq.) When a child under 16 is arrested for a crime cognizable in the adult justice system as a “juvenile offense”, the CPL requires that the police officer notify the parent or other legally responsible person of the arrest and the place of detention. (CPL 120.90, subd 7; 140.20, subd 6; see, also, CPL 140.40, subd 5.) A similar duty is imposed by the Family Court Act in regard to youths the same age who are arrested for acts constituting “juvenile delinquency”. These statutes in turn, reflect the constitutional mandate that the police take more care to safeguard the rights of potentially bewildered and ignorant youths than may be required when they question adults. (Haley v Ohio, 332 US 596; Gallegos v Colorado, 370 US 49.)
The Family Court Act, unlike the Criminal Procedure Law, however, accords minors additional safeguards beyond parental notification. Thus, youths charged with delinquency may be questioned only in specially designated facilities. And if a parent or guardian is present he or she, as well as the youth, must be advised of the latter’s constitutional rights (Family Ct Act, § 305.2, subds 4, 7).
Although the CPL does not extend these additional safeguards to juvenile offenders, the defense has persuasively argued-that this court should do so, inasmuch as the 1978 Juvenile Offender Law was not designed to relax police caution in questioning children. Rather, it was intended to authorize lengthier incarceration and adult court processing for youths convicted of serious crimes. This was a reaction to what were perceived as the inappropriately lenient sentences and procedures of the Family Court. Serving public safety by authorizing longer confinement for convicted youthful felons, however, does not dilute the need to protect young suspects during the investigative *346 process. Whether the prescriptions of the Family Court Act should therefore apply to juvenile offenders, is a moot question in this case, however. For here, Detective Miller did follow those procedures. He did not begin to question Susan until her father arrived and each of them were advised of her rights. Both he and the Assistant District Attorney conducted their interviews in the specially designated juvenile room. (See Family Ct Act, § 305.2, subds 3, 4, 6, 7.)
APPOINTMENT OF A SPECIAL GUARDIAN
The defense has argued, however, that because Susan’s father was one of her intended victims, his presence during the questioning was inadequate to protect her rights. Because of this distinctive circumstance, it is claimed that the police were obliged to have a guardian appointed for her before questioning her, and that their failure to do so rendered her precinct statements inadmissible.
Even in the more solicitous context of the Family Court, a special guardian would not have been required for Susan. Neither statute nor case law calls for per se exclusion of statements even where no parent or guardian attends the interrogation of a juvenile. The Family Court Act requires only that Miranda warnings be given to a parent or other guardian “if present” (Family Ct Act, § 305.2, subd 7; emphasis supplied), necessarily implying that a parent’s presence is not always feasible and that questioning may proceed nonetheless. The presence or absence of parents is only one of a number of factors to be considered by a Family Court in determining the reasonableness of questioning and the voluntariness of a juvenile’s statement. (Family Ct Act, § 305.2, subd 8; see Sobie, Practice Commentary, McKinney’s Cons Laws of NY, Book 29A, Family Ct Act, § 305.2, p 301.)
Indeed, the Family Court Act and the cases interpreting it recognize what is, unfortunately, a not uncommon situation — an uncooperative or even hostile parent who refuses to attend the questioning or who is otherwise unavailable. (See, e.g., Matter of Raphael A., 53 AD2d 592.) As long as the police have made reasonable efforts to notify and to await the arrival of the parent, they are free to question. (Matter of Emilio M., 37 NY2d 173; Matter of Raphael A., *347 supra; cf. Matter of Brian P. T., 58 AD2d 868; Matter of Kevin R., 42 AD2d 541.) Statements obtained in such circumstances are admissible as long as they are otherwise voluntary.
The defendant’s reliance upon Matter of Michelet P. v Gold (70 AD2d 68) is misplaced in fact and in principle. There, a 15-year-old resident alien was charged with murdering the person with whom he resided; when the police sought to question him, no parent or other legally responsible person was available. The Second Department held that the adult son of the victim, who had no special relationship to the juvenile, was not the proper person to notify or to act as his guardian. Under those circumstances, the court observed, the police should have brought Michelet to Family Court to have a guardian appointed. Unlike Michelet P., however, Susan had parents who did come to the precinct.
On a broader level, the claim that a State-appointed guardian would have been better suited to safeguard Susan’s welfare than her own father, does violence to constitutional principles of family privacy and integrity. Deeply rooted in our law is the presumption that a child’s interests are best protected by her own parents and not by the State. (Quilloin v Walcott, 434 US 246, reh den 435 US 918; Matter of Hofbauer, 47 NY2d 648; Matter of Bennett v Jeffreys, 40 NY2d 543.) This presumption has, in recent years, acquired express constitutional status through the First, Ninth and Fourteenth Amendments to the United States Constitution, as well as in the State Constitution (Stanley v Illinois, 405 US 645). The parental presumption can, of course, be overcome by evidence of substantial parental neglect, not by mere parental imperfection. (Bennett v Jeffreys, supra.) Here, no such neglect was evident, either to the police at the time of the interrogation or in the course of the Huntley hearing.
Susan is obviously a deeply troubled girl whose young life has been filled with pain. She is experiencing great rage at her parents. Her anger toward them, however, does not of itself destroy the presumption that Susan’s parents, as opposed to some stranger, were best equipped to protect her rights. Conflict and stress between parent and child is *348 a classic symptom of adolescent disfunction. It does not mean that parents are unfit. The police in this case had no reason to believe the H.’s were neglectful or unconcerned about their daughter. Detective Miller properly turned to them to fulfill the notice requirement and to safeguard Susan’s interest.
Even if Miller had been aware that Susan had tried to kill her parents — and it is not clear that he knew that when he started to question her — that alone did not negate her father’s presumptive competence to protect her. A 15 year old’s murderous rage at her parents does not make them any less her parents. Nor did any of the hearing testimony rebut the H.’s presumptive concern for Susan. That Mr. H. did not counsel Susan to remain silent and did not provide her with a lawyer certainly does not signify that he was unconcerned or was acting contrary to her interest. He knew that Susan had already confessed to the neighbors and he reasonably perceived that the police were not mistreating her. Although another parent might have proceeded differently, a father’s wish that his child tell the police the truth does not, it need hardly be said, suggest parental neglect.
Susan’s allegations to neighbors of her father’s sexual abuse is troubling indeed. It is impossible to assess those charges, however, since Susan did not testify and the father resolutely denied them. Their mere assertion is, of course, further evidence of Susan’s troubled relationship with her parents. There is no indication, however, that the police were aware of Susan’s claim. Nor can the police, when seeking to question a juvenile suspect about a serious crime, be expected first to conduct a psychiatric or sociological examination of the family. While a patently unfit parent, such as one who is drunk at the precinct, might complicate the officer’s responsibility to a young suspect, that was not the case here.
Mr. and Mrs. H., by virtue of their rigidity and age, may be less than ideal parents for a troubled girl with a history of maternal abandonment and multiple foster placements. Falling short of the ideal, however, is a far cry from being unfit or incompetent to protect her. Nothing that was evident to the police, or that was determined after the fact, *349 required the appointment of a guardian for Susan before she could be questioned. No such duty was imposed on the police, either by the spirit or letter of the law, or by the facts of this case.
TOTALITY OF CIRCUMSTANCES
In the final analysis the relevant inquiry, as it is for all suspects, is whether this young girl understood her rights, knowingly waived them, and spoke voluntarily. (Fare v Michael C., 442 US 707; People v Ward, 95 AD2d 351.) It is evident from all the circumstances that she did. Susan’s age is only one consideration, albeit an important one, in determining voluntariness. The other relevant circumstances include her prior friendly relationship with Detective Miller, the brevity of the interrogations in the comparatively noncoercive atmosphere of the juvenile room, the absence of any pressure on her, her earlier volubility to the neighbors, and her demeanor on the videotape.
Nor did Susan’s earlier confession to officers at the fire scene, without benefit of parental notice or of Miranda warnings, mitigate the voluntariness of her later statements at the precinct. When Susan drove away from the fire scene with Detective Miller, the circumstances of her custody altered both temporally and psychologically. None of the officers to whom she had spoken earlier came to the station house. Thus, the precinct interrogation more than an hour later was separate and distinct from what had occurred earlier and was not part of a continuous course of interrogation initiated at the scene of the fire. (People v Chapple, 38 NY2d 112; People v Bodner, 75 AD2d 440; see Westover v United States, 384 US 436.) The earlier questioning, moreover, was itself only minimally custodial. Apart from the failure to give Miranda warnings or parental notice, it was characterized by no other abuse or impropriety. (People v Stephen J.B., 23 NY2d 611; People v Jennings, 40 AD2d 357, affd 33 NY2d 880.)
Nor was Susan under any compulsion to confess at the precinct because of what she had said to the officers earlier (the “cat-out-of-the bag” theory). Well before she encountered any officers, Susan had described to numerous neighbors how and why she had started the fire. It was not *350 her un-Mirandaized repetitions to the fire marshal that impelled her to confess at the precinct and she offered no testimony to that effect. (See People v Tanner, 30 NY2d 102,105-106; People v Glover, 58 AD2d 814, 815; Matter of Manuel O., 76 Misc 2d 1016,1019-1020.) Rather, if the cat was out of the bag, it was let loose to the neighbors well before Susan was questioned by any officers.
Finally, the presence of Susan’s father during the questioning, notwithstanding her antipathy to him, did not create a coercive atmosphere. As viewed on the video, Susan’s affect and attitude toward him can best be described as disdainful or even contemptuous, while his appears dejected or weary. Whatever their pathology, the father’s presence does not appear to intimidate Susan.
In sum, the police discharged their duty to this young girl. They notified her parents, as they were obliged to do, and they awaited the father’s arrival before questioning her. They fully advised her and her father of her rights and took statements from her that were entirely voluntary. Accordingly, the motion to suppress them is denied.