595 So.2d 514 (1991)
O.M.
v.
STATE.
CR 90-573.
Court of Criminal Appeals of Alabama.
September 20, 1991.
Rehearing Denied October 25, 1991.
*515 Richard S. Jaffe and Stephen A. Strickland of Jaffe, Burton & DiGiorgio, Birmingham, for appellant.
James H. Evans, Atty. Gen., and J. Randall McNeill, Asst. Atty. Gen., for appellee.
BOWEN, Judge.
O.M. appeals from orders of the juvenile court transferring him to circuit court for prosecution as an adult for the crimes of arson and murder.
On the evening of May 12, 1988, the 16-year-old appellant, his 17-year-old uncle S.T., and his adult uncle Yul "Bobo" Guice, *516 were involved in a fight at a housing project in Gadsden. Their adversaries included Anthony "Scoop" Sharp, Sol Reynolds, and Benny Brown. The fight erupted after Brown made a disparaging remark about a woman who was the aunt of appellant and the sister of S.T. and Yul Guice.
The State's theory of the case was that after the fight, the appellant and S.T. helped Guice seek revenge on Sharp, Reynolds, and Brown by pointing out to Guice the apartment occupied by their adversaries. Guice threw a firebomb into that apartment and 14-month-old Tamel Jackson died in the resulting fire.
The primary evidence linking the appellant to the crimes of arson and murder came from the statements of D.S., the codefendant S.T., and the appellant.[1] Neither D.S. nor S.T. testified at the transfer hearing. Their out-of-court statements were admitted in evidence over the appellant's objection that the statements were hearsay and that their admission denied him his rights of confrontation and cross-examination. In addition, the appellant's statement was admitted over the objection that it violated Rule 11, Ala.R.Juv.P., and that it was involuntary. The juvenile court ruled that because a transfer proceeding was a probable cause hearing, hearsay was admissible and the appellant had no right of confrontation and cross-examination. The court found that the appellant's statement was obtained in conformity with Rule 11 and that it was voluntary.

I
The appellant argues that the court erred by concluding that a juvenile does not have the right of confrontation and cross-examination at a transfer hearing.
A juvenile transfer proceeding is a "probable cause hearing" Brown v. State, 353 So.2d 1384, 1387 (Ala.1977); Gallagher v. State, 425 So.2d 1079, 1080 (Ala.1983), at which hearsay is admissible, Gulledge v. State, 419 So.2d 219, 220-21 (Ala.1982). Compare Rule 5.3(c), A.R.Cr.P. (Committee Comments) ("There is no constitutional requirement that hearsay evidence be excluded from a probable cause hearing," citing Costello v. United States, 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1956)).
However, the fact that hearsay is admissible at a transfer hearing does not resolve the appellant's confrontation argument. The right of confrontation is not necessarily coextensive with the hearsay rule. Evidence admissible over a hearsay objection may be inadmissible because it violates the right of confrontation and cross-examination. See Grantham v. State, 580 So.2d 53 (Ala.Cr.App.1991) (wherein this court held that admission of toxicology report, admissible under public record exception to the hearsay rule, denied accused the right to confront and cross-examine toxicologist who did not testify).
"Similarly, in probation revocation cases, where hearsay evidence is admissible at the discretion of the trial judge whether or not it is within one of the recognized exceptions, this Court has held that hearsay cannot be the sole basis for the revocation of probation because such a practice denies the probationer his right to confront the witnesses against him. Mallette v. State, 572 So.2d 1316, 1317 (Ala.Cr.App.1990); Mitchell v. State, 462 So.2d 740, 741-42 (Ala.Cr.App.1984); Hill v. State, 350 So.2d 716, 718 (Ala.Cr. App.1977). See also Ex parte Belcher, 556 So.2d 366, 369 (Ala.1989)."
Grantham, 580 So.2d at 57. In California v. Green, 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970), the United States Supreme Court observed:
"While it may readily be conceded that hearsay rules and the Confrontation Clause are generally designed to protect similar values, it is quite a different thing to suggest that the overlap is complete and that the Confrontation Clause is nothing more or less than a codification of the rules of hearsay and their exceptions as they existed historically at common law. Our decisions have never established such a congruence; indeed, we have more than once found a violation of confrontation values even though *517 the statements in issue were admitted under an arguably recognized hearsay exception."
Green, 399 U.S. at 155-56, 90 S.Ct. at 1933-34.
Before 1985, the Alabama Supreme Court held that "constitutional questions concerning the admissibility of evidence ... may be relevant at a later proceeding [but] they are not appropriate in a transfer hearing." Snow v. State, 423 So.2d 220, 222 (Ala.1982). See also Winstead v. State, 371 So.2d 418, 420 (Ala.1979). In 1985, however, the Court disavowed prior cases and ruled that "[t]o relax the strict rules of evidence for purposes of the transfer hearing, when its application is restricted to matters ordinarily governed by the rules of evidence, is one thing; but to carry its application to the extent of allowing the admission of an otherwise inadmissible statement ... is constitutionally impermissible." Ex parte Whisenant, 466 So.2d 1006, 1008 (Ala.1985).
Since Whisenant, the Alabama Supreme Court has been especially protective of the rights of juveniles at transfer proceedings despite the fact that at those proceedings, "strict rules of evidence do not apply." See Ex parte W.T.K., 586 So.2d 850 (Ala. 1991). The Court has declared that "[i]t is particularly important to protect a juvenile's constitutional rights at a transfer hearing. To transfer a juvenile and subject him to adult treatment without protecting his constitutional rights is impermissible." Id. Our Supreme Court has reiterated the United States Supreme Court's observation that "a transfer hearing is a `"critically important" proceeding' in juvenile criminal procedure. Kent v. United States, 383 U.S. 541, [560, 86 S.Ct. 1045, 1057, 16 L.Ed.2d 84] (1966). A transfer hearing `must measure up to the essentials of due process and fair treatment.' Kent, 383 U.S. at 562[, 86 S.Ct. at 1057]." W.T.K., 586 So.2d at 851.
The Alabama Supreme Court has made it clear that evidence which could not be constitutionally admitted at a criminal trial should be excluded from a transfer hearing. Ex parte Whisenant, 466 So.2d at 1008 (statement of juvenile obtained without warning of rights under Rule 11, Ala. R.Juv.P.); Ex parte W.T.K., 586 So.2d at 852 (statement of juvenile obtained as the fruit of an unlawful arrest).
In the present case, the appellant cross-examined the witnesses who actually appeared in person and testified at the transfer hearing. Compare Gerstein v. Pugh, 420 U.S. 103, 123, 95 S.Ct. 854, 867, 43 L.Ed.2d 54 (1975) (wherein the Supreme Court noted that "Alabama allow[s] the suspect to confront and cross-examine prosecution witnesses at [a] preliminary hearing"); 2 W. LaFave & J. Israel, Criminal Procedure § 14.4(b) at 267 (1984) ("All jurisdictions grant the defense a right to cross-examine those witnesses presented by the prosecution at the preliminary hearing"). See also Ala.Code 1975, § 15-11-6 (At a preliminary hearing "[t]he court ... must examine the complainant and the witnesses for the prosecution on oath ... in the presence of the defendant").
The issue here is whether the appellant had the right to confront and cross-examine those witnesses who did not testify, that is, D.S. and S.T., and whose out-of-court statements were admitted through the testimony of another witness.
Although juvenile transfer hearings are analogous to preliminary hearings, we need not decide whether or to what extent the rights of confrontation and cross-examination exist at a preliminary hearing because those rights apply to a juvenile transfer hearing in Alabama by virtue of court rule and statute. Rules 11(H) and (I), Ala. R.Juv.P., provide that "[t]he child, through his attorney, has the right to cross-examine witnesses," and that "[t]he child has the right to confront all witnesses against him unless the court finds that such confrontation would not be in the best interests of the child."
Rule 11 applies to "all matters in the juvenile court," see Rule 1, Ala.R.Juv.P., and is not restricted to the adjudicatory phase. Rules 11(H) and (I) do not, on their face, limit the child's right of confrontation by reference to acceptable "forms" of hearsay.[2] *518 By the plain wording of Rule 11(I), the right of confrontation can be circumscribed only if the juvenile court judge finds that "such confrontation would not be in the best interests of the child." No such finding was made in the instant case. The juvenile court ruled that the right of confrontation and cross-examination simply did not exist at a transfer hearing.
We think the evidence admissible at a juvenile transfer hearing is necessarily different from the evidence admissible at a probation revocation hearing for three reasons, notwithstanding the fact that some hearsay is tolerated at both proceedings. First, and most obviously, Rules 11(H) and (I) require that juveniles be accorded the right to confront and cross-examine witnesses, whereas there is no corresponding rule governing probation revocation proceedings. Second, juvenile adjudication is the statutory right of the child, see Kent v. United States, 383 U.S. 541, 556-57, 86 S.Ct. 1045, 1055, 16 L.Ed.2d 84 (1966), whereas there is no statutory right to probation. See Ex parte Belcher, 556 So.2d 366, 369 (Ala.1989); Wray v. State, 472 So.2d 1119, 1121 (Ala.1985). Finally, the child who has not yet been the subject of a juvenile transfer hearing has forfeited no constitutional guarantees merely by being charged with a delinquent act, whereas a probationer has lost some constitutional rights as a consequence of being convicted of a criminal offense. See, e.g., Griffin v. Wisconsin, 483 U.S. 868, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987) (wherein the Court held that warrantless search of probationer's home on less than probable cause does not violate the Fourth Amendment).
Thus, at a probation revocation hearing, hearsay evidence, which denies the probationer the ability to confront the declarant, may be admitted and considered by the court, but it may not constitute the sole basis for probation revocation. Mallette v. State, 572 So.2d 1316, 1317 (Ala.Cr.App. 1990), and authorities cited therein. On the other hand, at a juvenile transfer hearing, hearsay evidence that violates the child's right of confrontation may not even be admitted, much less constitute the sole basis for a finding of probable cause to transfer the child to circuit court, because such a practice violates Rules 11(H) and (I) and Ala.Code 1975, § 12-15-66(b).
The first sentence of § 12-15-66(b) provides that "[a]n extrajudicial statement which would be constitutionally inadmissible in a criminal proceeding shall not be received in evidence over objection." Section 12-15-66(b) applies to transfer hearings, Ex parte Whisenant, 466 So.2d at 1008; Ex parte W.T.K., 586 So.2d at 852, and expresses a legislative policy of excluding, at juvenile proceedings, evidence which could not be constitutionally admitted in adult criminal proceedings.
We find nothing in the wording of the first sentence of § 12-15-66(b) which indicates that the provision applies only to extrajudicial statements made by the child charged with a delinquent act and not to all other extrajudicial statements which would be constitutionally inadmissible in an adult criminal trial. The plain wording of the provision mandates that any extrajudicial statement, not just an extrajudicial statement made by the juvenile who is the subject of the proceeding, be excluded if the admission of the statement in a criminal proceeding would be unconstitutional. Had the legislature intended to make the code provision applicable only to statements *519 of the child whose conduct was at issue, it could have made that intent clear, as it did in two other portions of § 12-15-66:
"(a) A child charged with a delinquent act or who is alleged to be in need of supervision shall be accorded the privilege against self-incrimination.
"(b) An extrajudicial statement which would be constitutionally inadmissible in a criminal proceeding shall not be received in evidence over objection. Evidence illegally seized or obtained shall not be received in evidence over objection to establish the allegations against him. An extrajudicial admission or confession made by the child out of court is insufficient to support a finding that the child committed the acts alleged in the petition unless it is corroborated by other evidence."
Ala.Code 1975, § 12-15-66 (emphasis added). Our finding that the Alabama legislature intended by § 12-15-66(b) to provide for the exclusion, at a juvenile transfer hearing, of all statements (including those made by absent declarants not subject to cross-examination) the admission of which in a criminal trial would be unconstitutional is further supported by reference to a companion statute. Section 12-15-65(a) states, in pertinent part: "If the court finds that it is in the best interest of the child, his presence may be temporarily excluded from the hearings, except while allegations of delinquency or in need of supervision are being heard." Ala.Code 1975, § 12-15-65(a) (emphasis added). Citing this statute in a footnote, one commentator has observed that "some states provide that the presence of the child may be waived except in delinquency proceedings, apparently out of regard for the significance of the rights to confrontation and cross-examination in a case in which the child is alleged to have violated the law." S. Davis, Rights of Juveniles § 5.6 at 5-27 n. 118 (2d ed. 1990) (emphasis added).
We hold that a juvenile has the rights of confrontation and cross-examination in a transfer hearing by virtue of Rules 11(H) and (I), Ala.R.Juv.P. We also hold that because an extrajudicial statement which violates the right of confrontation is constitutionally inadmissible in an adult criminal proceeding, see, e.g., Pointer v. Texas, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965), it is, by virtue of § 12-15-66(b), inadmissible at a juvenile transfer hearing. We must now determine whether the statements of D.S. and S.T. violated the appellant's right of confrontation.
"[T]he Confrontation Clause `operates in two separate ways to restrict the range of admissible hearsay. First, ... the Sixth Amendment establishes a rule of necessity. In the usual case ..., the prosecution must either produce or demonstrate the unavailability of, the declarant whose statement it wishes to use against the defendant.' Second, once a witness is shown to be unavailable, `his statement is admissible only if it bears adequate "indicia of reliability." Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception. In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness.'"
Idaho v. Wright, 497 U.S. 805, ___, 110 S.Ct. 3139, 3146, 111 L.Ed.2d 638 (1990) (quoting Ohio v. Roberts, 448 U.S. 56, 65, 100 S.Ct. 2531, 2538-39, 65 L.Ed.2d 597 (1980)). See also Grantham v. State, 580 So.2d 53 (Ala.Cr.App.1991); Fortner v. State, 582 So.2d 581 (Ala.Cr.App.1990).
In the present case, the State did not attempt to prove that either D.S. or S.T was unavailable. In fact, the prosecutor stated in open court that he was aware that D.S. was presently "incarcerated at Mount Meigs, Montgomery." Although the prosecutor made no statement regarding the whereabouts of S.T., it is clear that S.T., a codefendant charged with the same crimes as the appellant, see Thomas v. State, 550 So.2d 1057 (Ala.Cr.App.), affirmed, 550 So.2d 1067 (Ala.1989), was also presently incarcerated and his location was known to the State.
We note that the statement given to the police by D.S., claiming to be an eyewitness to the alleged firebombing, also did not *520 satisfy the second part of the Confrontation Clause inquiry announced in Ohio v. Roberts. D.S.'s statement neither "[fell] within a firmly rooted hearsay exception" nor bore other "indicia of reliability." Ohio v. Roberts, 448 U.S. at 66, 100 S.Ct. at 2539. The statement was the rankest of hearsay and was demonstrably unreliable.
At the transfer hearing, the mother of D.S. testified that her son could not possibly have seen who was responsible for the fire because he was at home with her at the time. In addition, she stated that D.S. was a "compulsive liar" and had a "mental problem." She testified that D.S. had been treated at the East Gadsden Mental Health Center off and on for four years and that he was currently receiving Social Security disability benefits because of his "mental state." The grandmother of D.S. testified that D.S. "just about always lies."
LaRue Gray, D.S.'s juvenile probation officer, stated that she had been working with D.S. since he was nine years old, that she had "questions at times about his credibility," and that she did not "know if [she] would believe him under oath." Defense counsel made an offer of proof, asserting that Ms. Gray's testimony would show that
"[D.S.] is down there at Mount Meigs and is continuing to make up things in this case because a motion to transfer [D.S. on another matter] was filed by Ms. Gray.... [W]e think we can show the authorities asked Ms. Gray not to push [the motion to transfer D.S.] and there was some kind of concessions made to D.S. about [his] most recent case since he was still a witness in this case."
R-408. The juvenile court ruled this line of inquiry irrelevant.
Defense counsel also attempted to question the police officer through whom D.S.'s statement was admitted about the number of juvenile adjudications D.S. had received. Ruling that the subject was "confidential," the juvenile court also disallowed that inquiry.
Conceding that the defense had "cast serious aspersions" on the credibility of D.S. and assuring defense counsel that he would "consider that before ... ruling," the juvenile judge stated that the "only way [he] would completely and totally discredit [D.S.'s statement was] if [the defense] satisfied [him] that [D.S.] never told the truth." R-411. (Emphasis added.)
This case is illustrative of the reason underlying the Sixth Amendment's "preference for face-to-face accusation," Ohio v. Roberts, 448 U.S. at 65, 100 S.Ct. at 2538, in a criminal proceeding. Had D.S. testified at the appellant's transfer hearing, the juvenile judge as the finder of fact could have made a firsthand assessment of D.S.'s credibility, and would not likely have demanded secondary evidence to "satisfy [himself] that [D.S.] never told the truth."
A denial of the right of confrontation may, in some circumstances, constitute harmless error. Delaware v. Van Arsdall, 475 U.S. 673, 680-84, 106 S.Ct. 1431, 1436-38, 89 L.Ed.2d 674 (1986). It was not harmless here. D.S., the unconfronted and uncross-examined witness, was the only eyewitness to the alleged firebombing and his statement was extremely damaging to the appellant. We note that even under the rules of procedure for an adult preliminary hearing, D.S.'s statement would not have qualified as a form of hearsay which could support a probable cause finding because there was no "substantial basis for believing ... its source [was] credible." See Rule 5.3(c)(3), quoted in note 2, supra.
The appellant is entitled to a new hearing at which the prosecution must, if it desires to present evidence by D.S. and S.T., tender them as witnesses. The defense shall be entitled to cross-examine D.S. and S.T. about their prior juvenile records, as well as about any "concessions" made to them for their cooperation in the present case. See Davis v. Alaska, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974).

II
The appellant contends that his statement should have been suppressed on a number of grounds. He claims that it was not the product of a knowing and intelligent waiver of his rights because of *521 his low IQ and poor reading ability. He maintains that it was involuntary because it was the product of threats by the police and a member of the victim's family, as well as an implied promise to release him if he would "talk." He also argues that his detention was illegal because he was incarcerated in an adult facility in violation of Ala.Code 1975, § 12-15-61(b), beyond the restrictions set out in § 12-15-59, and because the police failed to comply with the parental notice and advice provision of Rule 11(C), Ala.R.Juv.P.
The evidence on the question of voluntariness was in conflict. The following facts were undisputed:
After having talked with witnesses, including D.S., about the firebombing that occurred on May 12, Gadsden police officers Jeffery Wright and Dewayne Hopper arrested the appellant at his home pursuant to a juvenile "pick-up order" between 3:20 and 3:30 p.m. on Friday, May 13. Mrs. M., the appellant's mother, was not at home. The officers learned from the appellant's sister, who was present, that the appellant's mother was at work. The officers asked the sister to tell Mrs. M. that they had taken the appellant to City Hall.
Mrs. M. arrived home from work at 1:00 a.m. the following morning, Saturday, May 14. Her daughter told her that the appellant had been picked up by the police and taken to City Hall. Mrs. M. went to the Gadsden City Hall about 1:00 p.m. that same day and asked to see her son. She was told that he was being questioned and that she could not see him.
Officers Wright and Hopper, as well as Sgt. Troy Higdon of the Gadsden Police Department, questioned the appellant on Friday, May 13. They told the appellant that he was being investigated for arson and murder.
The State's evidence on the question of voluntariness established that the officers explained to the appellant his juvenile rights pursuant to Rule 11(A)(1)-(4), Ala. R.Juv.P., stopping after each portion to ascertain whether the appellant understood what they were saying. According to the officers, the appellant never asked any questions and stated that he understood his rights. He did not ask to speak to his mother. The appellant signed a waiver of rights form at 3:40 p.m. on May 13 and was then questioned for about four hours. He denied any involvement in the firebombing.
While the appellant was being interrogated, his uncle, S.T., and S.T.'s parents (the appellant's grandparents) arrived. S.T.'s parents were told that the police were questioning the appellant and that they (Mr. and Mrs. T.) could not see the appellant.
After interrogating the appellant on Friday afternoon, the Gadsden police officers contacted Barbara Pyron, a juvenile probation officer, and the appellant was transported to the Etowah County Jail. In May 1988, Etowah County juveniles were detained either in the Coosa Valley Youth Detention Center or in the Etowah County Jail, which had been licensed by the Alabama Department of Youth Services for temporary detention of juveniles. None of the State's witness knew whether there was any space available for the appellant at the Coosa Valley Youth Detention Center.
The appellant spent Friday night and Saturday in the county jail. The next day, Sunday, May 15, the appellant was released from the county jail at 10:35 a.m., transported back to the Gadsden City Hall, and again read his juvenile rights. The officers testified that neither they nor anyone in their presence offered the appellant any reward, promised him anything, or coerced or induced him to give a statement. The appellant stated that he did not want to speak to his mother. The appellant signed a waiver at 10:45 a.m. and made a statement which was tape-recorded and later reduced to writing. The officers went over the written statement with the appellant and he acknowledged that it was correct. The appellant was then released to his mother on the condition that he submit to further questioning by the police if requested.
The appellant testified that he was not told on Friday that he could have his mother with him while he was being questioned. *522 He stated that had he been told, he would have wanted her there. When shown the waiver of rights form, he acknowledged that the signature was his, but he stated that he did not read the document because he could not read. He said that the police told him on Friday afternoon that his "black ass was going to burn over what happened."
According to the appellant, on Friday the police brought Sol Reynolds, a member of the victim's family and one of the group with whom the appellant had been fighting the previous day, into the room where the appellant was being questioned. The appellant said Reynolds told him that he and his family "had messed up" what they had "done." When the appellant replied that he had not done anything, he and Reynolds argued, and Reynolds was taken out of the room.
Sol Reynolds was called as a witness on the motion to suppress. He denied having had any conversation with the appellant on Friday, May 13 at City Hall. Officer Wright testified that Reynolds was never at City Hall while the appellant was being questioned. However, Sgt. Higdon testified that Reynolds was "probably there" that afternoon because Higdon saw Reynolds talking to Officer Wright and a statement was taken from Reynolds "during that time frame." However, Higdon did not recall whether Reynolds ever came into the room where the appellant was being questioned. Officer Hopper had no recollection of Reynolds' being at City Hall during this time period. At the close of the evidence on the motion to suppress, the prosecutor stipulated that Sol Reynolds had made a prior inconsistent statement, in the presence of the prosecutor, acknowledging that he, Reynolds, had talked to the appellant at City Hall on Friday, May 13.
The appellant testified that he asked a guard at the county jail on Saturday to call the officers who had brought him in. According to the appellant, two officers arrived, removed him from his cell, and took him to another room at the county jail. The appellant asked to go home and the officers said, "You have to talk to us." The appellant replied that he did not know anything and he was returned to his cell. Sgt. Higdon remembered that after the appellant was booked into the county jail, the appellant "called and told Lieutenant Hopper or the desk sergeant who in turn got in touch with Lieutenant Hopper that [the appellant] wanted to talk with someone, one of the police officers, he wanted to talk with one of the police officers." Higdon "assume[d] that Lt. Hopper" went over to see the appellant at the county jail, but he did not know who, if anyone, did. Neither Officer Hopper nor Officer Wright testified about any contact with the appellant on Saturday. The prosecution did not recall either officer to the stand to rebut this portion of the appellant's testimony.
The appellant stated that on Sunday he asked if he could call his mother and that he was told, "Your mother knows where you're at." He said that Officers Wright, Hopper, and Higdon told him that S.T. had been allowed to leave after he gave them a statement. Then they played a portion of S.T.'s tape-recorded statement for him. According to the appellant, the officers threatened that if he did not give a statement he was not going home, but would be taken upstairs to the city jail. The appellant testified that he made a statement because he had never been imprisoned before and he was "scared of going upstairs because [he] didn't know what would happen to [him]." He stated that his father had been killed by the police and an uncle had committed suicide in jail. He was told that if he talked he could go home.
Dr. William B. Beidleman, a clinical psychologist who conducted a three-hour interview with the appellant on October 13, 1990, testified that the appellant had an IQ of 70, which is in the mild range of mental retardation, and a mental age of 10½ years. Dr. Beidleman's test results were consistent with the scores the appellant received on other intelligence tests, including those from Gadsden High School where the appellant was a special education student. Dr. Beidleman testified that the appellant's vocabulary and reading skills were extremely poor. Appellant was reading on a 1.5 (first year, fifth month) grade level. *523 Dr. Beidleman "tried to get [the appellant] to take some ... tests and he couldn't read at a sufficient level to take any of them so [Beidleman] had to administer them."
Dr. Beidleman concluded from the appellant's performance on a comprehensive intellectual screening test that the appellant "couldn't understand items about waiving rights. He had no idea what it meant to waive something." The psychologist gave his opinion that the appellant could not have knowingly, intelligently, and voluntarily waived his rights unless "someone he could trust ... spent a couple of hours explaining" them to him. Dr. Beidleman did not think that the appellant had the capacity to validly waive his rights under the circumstances of this case. The appellant told Dr. Beidleman that he was scared about being in an adult jail because his father and uncle had been "involved with violent incidents with the police." The appellant said that on May 15 he "would more or less [have] sign[ed] anything that he was told ... to get out of jail."
Ms. Betsy Biben, a social worker for the Public Defender Service in Washington, D.C., who interviewed the appellant on six occasions and reviewed the results of his psychological and intelligence tests, testified that the appellant's academic deficiencies were extremely severe. Ms. Biben had observed the appellant "withdraw and try to be protective and not let people know how severe his deficits were."
Anthony Findley, a supervisor at Coosa Valley Youth Detention Center who had had frequent contact with the appellant, testified that although the appellant's reading skills were poor, he could compensate by listening. He stated that the appellant had no trouble following the rules at the detention center once they were explained.
We recognize that "[w]here, on the issue of the voluntariness of a confession, evidence offered by the defendant conflicts with that offered by the State, it creates a question of fact for the trial judge, Callahan v. State, 557 So.2d 1292, 1299 (Ala.Cr. App.), affirmed, 557 So.2d 1311 (Ala.1989), [cert. denied, ___ U.S. ___, 111 S.Ct. 216, 112 L.Ed.2d 176 (1990),]" and that "[a] trial judge's finding of voluntariness need only be supported by a preponderance of the evidence, Seawright v. State, 479 So.2d 1362, 1367 (Ala.Cr.App.1985), and `will not be disturbed on appeal unless found to be manifestly contrary to the great weight of the evidence.' Malone v. State, 452 So.2d 1386, 1389 (Ala.Cr.App.1984)," Dixon v. State, 588 So.2d 891 (Ala.Cr.App.1990), reversed as to result, 588 So.2d 903 (Ala. 1991).
Nevertheless, we have serious questions about the validity of the appellant's waiver of rights and the voluntariness of his statement because in addition to the conflict in the evidence offered by the defendant and the State, the State's own evidence is internally inconsistent.
For example, although the police officers asserted that they not only read the appellant his rights, but explained them to him, stopping periodically to ascertain whether he understood them, the documentary evidence makes this assertion highly questionable. On Friday, the appellant was picked up at his home between 3:20 and 3:30 p.m. He signed the first waiver of rights at 3:40 p.m. On Sunday, the appellant was released from the county jail, according to the jail log, at 10:35 a.m. He signed the second waiver at 10:45 a.m. Although there was no testimony regarding the driving time from the appellant's home to City Hall, there was evidence that it took "anywhere from five to twenty minutes" depending on traffic and other factors, to take the appellant from the county jail to City Hall and get him into the office where he was interrogated. Even allowing for the minimum traveling time, the State's evidence showed that only five minutes elapsed between the time appellant entered the interrogation room where his rights were explained to him and the time he signed the second waiver.
The State's evidence regarding whether Sol Reynolds was allowed to confront the appellant in the interrogation room was also inconsistent. Although Lt. Wright stated positively that Reynolds was never at City Hall during the time in question, Sgt. Higdon's testimony that he saw *524 Wright talking with Reynolds "during that time frame," and the prosecutor's stipulation that Reynolds himself had given a prior inconsistent statement, supports the appellant's version of what occurred.
Finally, the appellant's testimony that he was told on Saturday that he had to talk before he could go home, was totally unrebutted by the State. Sgt. Higdon's recollection that the appellant did, in fact, ask to speak to the officers and Higdon's "assumption" that Lt. Hopper went to the county jail to speak to the appellant, lends partial credence to the appellant's testimony on this point. Although Officers Hopper and Wright testified that they neither threatened, coerced, or induced the appellant to make a statement, that testimony related to the interrogation sessions on Friday and Sunday. The officers did not testify about any contact with the appellant on Saturday.
Since this cause must be remanded on other grounds, we caution the juvenile court that, as the record now stands, we cannot say that the State's evidence of the voluntariness of the appellant's confession was "clear and positive." See King v. State, 521 So.2d 1042, 1046 (Ala.Cr.App. 1987), cert. denied, 521 So.2d 1050 (Ala. 1988). Cf. Ex parte Johnson, 522 So.2d 234, 237 (Ala.1988) (statement held involuntary where trooper "could not affirmatively and unequivocally testify that he did not, at the time of the interview, tell [the defendant] that the accident report would not be used in Alabama, as [the defendant] asserts that he did"); McLallen v. Wyrick, 498 F.Supp. 137, 138 (W.D.Mo.1980) (where defendant testified that the prosecuting attorney induced him to make a confession and the sheriff's testimony corroborated this, federal habeas corpus court was "constrained to believe this testimony," even though prosecuting attorney denied making the alleged statements). At a new hearing on the admissibility of the appellant's incriminating statement, the juvenile court should keep in mind the Supreme Court's admonition that the question of the voluntariness of a juvenile's confession should be approached with the "greatest care." In re Gault, 387 U.S. 1, 55, 87 S.Ct. 1428, 1458, 18 L.Ed.2d 527 (1967).
The juvenile court should also take particular note of Ala.Code 1975, § 12-15-61(b), which provides:
"A delinquent child or a child alleged to be delinquent may be detained in a jail or other facility for the detention of adults only if:
"(1) No other detention facility is available;
"(2) The detention is in a room separate and removed from all contact with adult inmates;
"(3) Adequate supervision is provided; and
"(4) The facility is approved by the department of youth services."
Although the State proved compliance with the last three requirements of the statute, it put on no evidence regarding the first statutory requirement: the unavailability of any other detention facility. We do not deem compliance with § 12-15-61(b)(1) to be a mere technicality under the facts of this case, because the appellant argued that he gave the police a statement, in part, because of his apprehension about continued confinement in an adult jail.
We reject the appellant's argument that his statement was due to be suppressed because the police did not comply with the parental notice and advice provisions of Rule 11(C). That rule provides:
"When a child is detained, ... the person in charge of the intake office shall immediately attempt to notify the parents or guardian of the child of the detention. He shall also inform them of the child's rights and of their right to be represented by counsel throughout the proceedings. The parents or guardian shall also be informed of the child's right to remain silent."
Here, Mrs. M. had actual knowledge of her son's detention. See Carr v. State, 545 So.2d 820, 827 (Ala.Cr.App.1989). However, there was no testimony that Mrs. M. was informed of her son's rights, specifically his right to remain silent. Nevertheless, the failure to inform Mrs. M. of those rights does not, under the particular facts *525 of this case, affect the voluntariness of the appellant's statement. See Derrick v. Peterson, 924 F.2d 813, 819 (9th Cir.1990); United States v. White Bear, 668 F.2d 409, 412 (8th Cir.1982); People v. Susan H., 124 Misc.2d 341, 477 N.Y.S.2d 550 (App.Div. 1984). Mrs. M's ignorance of her son's rights was simply irrelevant to the question of whether the appellant understood his rights, knowingly waived them, and spoke voluntarily.
Had the appellant conferred with his mother before deciding to waive his rights, or had she been present during questioning, then his mother's unawareness of his rights would have been germane to the voluntariness of his actions. Compare People v. Susan H., 124 Misc.2d at 345, 477 N.Y.S.2d at 553 (wherein the court observed that "if a parent or guardian is present [for questioning] he or she, as well as the youth, must be advised of the latter's constitutional rights") (emphasis added). However, since the appellant never consulted his mother, her unawareness of his rights had no bearing on his decision to relinquish those rights. See Derrick v. Peterson, 924 F.2d at 819 (wherein the court held that the confession of accused was not involuntary when "the police failed to contact any of his relatives so that they could be present during interrogation [because the accused] did not request to speak to his relatives").
The appellant argues on appeal that "if [his] mother had been informed of his and her rights as required by Rule 11, [his mother] could have prevented him from waiving his Fifth Amendment rights." Brief of Appellant at 80-81. That may be true. However, "[i]n Alabama, there is no requirement that the juvenile's parents be notified before or be present when the juvenile waives his constitutional rights. Likewise, there is no statute mandating the presence of a parent, guardian, legal custodian or attorney of a child during interrogation." Ash v. State, 424 So.2d 1381, 1386 (Ala.Cr.App.1982). Therefore, unless the appellant requested to speak with his mother, whichviewing the evidence in the light most favorable to the Statehe did not do, he had no right to her aid. Compare S. Davis, Rights of Juveniles, § 3.13 at 3-64.4-64.5 (2d ed. 1990), wherein the author observes:
"Suppose the juvenile does not request to see or speak to a parent but the parent is waiting outside to see the juvenile. In the adult context the Supreme Court has held that an adult need not be advised of his attorney's presence in another room where the adult has not requested an attorney [citing Moran v. Burbine, 475 U.S. 412, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986)].... [S]ome state courts have held that the adult rule is inappropriate in application to juveniles and that a juvenile must be advised of the presence of the parent [citing cases from Maryland, California, and Illinois].
"In In re Gregory Z., [190 Cal.App.3d 1558, 235 Cal.Rptr. 918 (1987) ] however, the court held the confession of a fifteen-year-old juvenile admissible even though he was not advised that his mother was at the station asking to see him. Absent a request by the juvenile to speak to his parent, there was no duty to advise the juvenile of his mother's presence."
In United States v. White Bear, the arresting officers failed to advise the juvenile's mother of his rights as required by the Federal Juvenile Delinquency Act, 18 U.S.C. § 5033, which provided:
"Whenever a juvenile is taken into custody for an alleged act of juvenile delinquency, the arresting officer shall immediately... notify the ... juvenile's parents... of such custody. The arresting officer shall also notify the parents ... of the rights of the juvenile...."
White Bear, 668 F.2d at 411 (emphasis omitted). Reviewing the legislative history of § 5033 and the precepts of In re Gault, 387 U.S. at 55, 87 S.Ct. at 1458, the Court of Appeals for the Eighth Circuit observed:
"[W]hile we find merit to the appellant's argument that his mother could have aided him in the exercise of his constitutional rights, we are not persuaded that Gault or § 5033 mandate such parental consultation in order for a juvenile's incriminating statements to be admissible. *526 Rather, we think the requirement of notification to parents is intended to furnish an additional safeguard to insure that the juvenile's basic right to due process is not violated.5 The requirement does not implicate any constitutionally protected rights.
"5 United States v. Watts, 513 F.2d 5, 8 (10th Cir.1975); see also Holloway v. Wainwright, 451 F.2d 149 (5th Cir.1971) (interpreting a similar state statute). This court is aware that several states do require parental consultation in order for a juvenile's confession to be admissible.... We simply do not find the intent to require such consultation under the federal statute."
White Bear, 668 F.2d at 412 & n. 5. Like the Eighth Circuit Court of Appeals, we recognize that other jurisdictions require parental consultation in order for a juvenile's confession to be admissible. See, e.g., State v. Piper, 143 Vt. 468, 468 A.2d 554, 555 (1983) ("The interested-adult rule gives a juvenile the opportunity to consult with an interested, informed and independent adult before deciding whether to waive or assert his right to counsel and his privilege against self-incrimination"). Absent the juvenile's request for parental consultation, there is no such right of consultation under Rule 11 in Alabama. Thus, the violation of Rule 11(C) was error without injury.

III
The appellant maintains that this court should interpret § 12-15-34 to require "clear and convincing evidence" to support the transfer of a juvenile to circuit court for prosecution as an adult. On this issue, we note that Justice Kennedy's opinion in Ex parte J.R., 582 So.2d 444 (Ala. 1991) (dissenting from the quashing of a writ of certiorari by the Alabama Supreme Court), presents a solid case for application of the "clear and convincing" standard of proof at the dispositional phase of a juvenile transfer proceeding. We adopt Justice Kennedy's dissenting opinion on this issue and direct the juvenile court to apply its precepts on remand.
The orders of the juvenile court finding probable cause to believe that the appellant committed the crimes of arson and murder and transferring him to the circuit court for prosecution as an adult are reversed. The appellant is entitled to a new transfer hearing conducted in conformity with the principles set out herein.
REVERSED AND REMANDED.
All Judges concur.

APPENDIX A
The statement given to the police by D.S. reads as follows:
"Around 6:00 p.m. last night I was sitting in my mom's car and I saw everybody running through the breezeway toward Alford's store so I got out of the car and went over to the store also to see what was going on. When I got there I saw two people fighting, Scoop and [S.T.].... I saw Scoop fall towards a mail box and [S.T.] swung at him with an axe. I don't think the axe hit him because he got up and started running. While he was running [O.M.] threw a stick and hit him in the back. He just kept running and ran into his apt. on 14th St. After he got in his house [O.M.] pointed out to Bobo and [S.T.] and a few more people which apartment that Scoop had ran into. I heard someone say, "Let's go but we will be back." Everyone left and a little after 9:00 p.m. I saw Bobo, [S.T.], and [O.M.] standing out back of the apartment. I saw one of them throw something into the apartment but I don't know which one it was. When they threw it I heard glass break and then saw a fire break out. After they threw it I saw all of them run towards 15th St. then turn towards the swimming pool and that was the last I saw of them. I left and went home then came back when I heard the sirens." CR-175.
S.T. gave the following statement:
"On May 12, 1988 around 6:30 p.m. I was at home and my mother told me that Benny Brown had been harassing my sister. He was saying that the only reason my sister Loretta Thomas worked at Alford's store was because she was fucking Mr. Alford and sucking his dick. So *527 I left my house to go and find Benny Brown. While I was walking on 4th Ave I saw my brother Yul Guice (Bobo) in front of his girlfriend's house Gene Suttles pouring gas from a five gallon white plastic container into Gene's green car. I walked to Alford's but I did not see Benny Brown. I walked to 14th Street and found Benny near the apt. that burned later that day. We got into a fight and Benny ran to Alford's store. I ran after him and when I got to Alford's store my sister Loretta grabbed me. I saw Yul, [O.M.], and [two other people] running toward the house that burned on 14th Street. I broke away from my sister Loretta and ran after them. I saw [O.M.] pointing and telling Yul what apt. Sol Reynolds, Benny Brown, and Scoop (I don't know his real name) ran in. We went back to Alford's and Yul left. Sol, Scoop, and Benny came back to Alford's store. All of us got in a fight again. A lady by the name of Pat had passed out on the ground outside of Alford's and the paramedics and police came. We ran behind Tony Williams' house which is on Chestnut Street. I picked up a five pound weight and was going to hit Benny Brown and Michael Cranfield grabbed it so I could not hit Benny. The police came and we went to [O.M.'s] house. Scoop's aunt lives next to [O.M.] and Scoop came outside. Me and [O.M.] started throwing drink bottles at Scoop. Mother came down the street cursing so me, [O.M.], and [two other people] ran to my house. [The two others] stayed about a minute and then they left. Between 8:00 p.m. and 8:15 p.m., me and [O.M.] left and went back to Alford's store. When we got there Yul was there. He told us to come and go with him.... I saw something stuck in the front of Yul's pants and I thought he had a gun and was going to shoot Sol, Benny, and Scoop. [O.M.] told me that he didn't want to go but if I was going then he would go. When we got behind the apt that Sol, Benny, and Scoop was in I saw Yul pull out a bottle from the front of his pants. It looked like a large wine bottle, and it had a blue cloth stuck down in the top of it and wrapped around the neck of it. Yul said, "I'm tired of them fucking with us," and he took a cigarette lighter and lit the cloth. Me and [O.M.] started backing off because it made a big flame. While I was walking away I saw Yul throw the bottle that was on fire at the apt. that they were in. I heard a thud sound of when it hit. Then I saw the flames inside the apt. We started to run and Yul told us to walk...." CR-389-90.
The appellant gave the following account of events after the fight:
"We then walked across the street and Bobo [Yul Guice] came out from around the corner of the store and we ran back around to where [Sol, Benny, and Scoop] went into the house to show Bobo which house they went into. We got over to the house and Bobo said, "Which one did they go into?" and I pointed to the one that they went into and he said, "Go get my shit." Then my grandmother came over and told us to go home. All of us then went back around to the store.... [We] were walking down the street and we met Bobo coming from around the back of his girlfriend's house. Bobo told me and [S.T.] to go with him.... Me, Bobo, and [S.T.] started walking up 4th Av. and Bobo said, "Don't worry about it; we're going to get them back." We... came in behind the building that Sol and Scoop had went into earlier. When we got to the back of the building Bobo reached in his jacket and pulled out a bottle, it was a big bottle like a 16 oz. Coke bottle. It had a piece of cloth in the top of it. Bobo then reached in his pocket and pulled out a lighter and lit the cloth. Bobo had the bottle in his hand and reached back to throw it and me and [S.T.] turned and ran. I heard the bottle hit and I heard glass break then there was a big whoosh sound. We ran back the same way we came in except we ran down the alley behind the AA building. We went to my grandmother's back yard *528 and Bobo told us to be quiet and not to say nothing." CR-385-86.
NOTES
[1] The three statements are contained in Appendix A to this opinion.
[2] Compare Rule 5.3, A.R.Cr.P., which does not mention the right of confrontation but which spells out what "forms" of hearsay may support the probable cause determination at a preliminary hearing:

"(c) The findings by the court shall be based on substantial evidence, which may be hearsay, in whole or in part, in the following forms:
"(1) Written reports of expert witnesses;
"(2) Documentary evidence without a proper predicate, provided there is a substantial basis for believing such predicate will be available at trial and that the document is otherwise competent; or
"(3) Testimony of a witness concerning the declarations of another where such evidence is cumulative, or there is a substantial basis for believing that the source of the hearsay is credible and that a factual basis for the information furnished exists and there is no reason for believing the declarant will not be personally available for trial."